**COMMONWEALTH of Pennsylvania,**
**Appellee,**

v.

**Kwasi Husani JOHNSON, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 21, 2003.

Filed Sept. 25, 2003.

Jessica B. Rhoades, Pub. Defender, Carlisle, for appellant.

Jaime M. Keating, Asst. Dist. Atty., Carlisle, for Com., appellee.

Before: JOHNSON, LALLY–GREEN and POPOVICH, JJ.

POPOVICH, J.

¶ 1 Appellant Kwasi Husani Johnson appeals the judgment of sentence imposed following his conviction of Unlawful Possession of a Schedule I Controlled Substance (phencyclidine), 35 P.S. § 780–113(a)(16). Appellant contends that the trial court erred in refusing to suppress evidence of contraband seized during an encounter with a Pennsylvania State Trooper. Upon review, we affirm the judgment of sentence.

¶ 2 This matter arose following a traffic stop during which State Trooper Brian Overcash pulled over the vehicle in which Appellant was a passenger. Appellant does not contest the legality of that stop. However, events during the stop prompted the trial court to conclude that Trooper Overcash lawfully detained Appellant after the vehicle stop had ostensibly concluded. The evidence concerning those events establishes that on April 8, 2000, Trooper Overcash stopped the vehicle on the Pennsylvania Turnpike for exceeding the speed limit. The occupants of the vehicle included Appellant, who was riding in the backseat; the driver, Jarron Bell; and a front seat passenger, Kijafi Linnen–Fuqua. After Bell stopped his vehicle, he exited his vehicle and walked at a hurried pace toward the trooper's patrol car. Trooper Overcash considered Bell's actions unusual and ordered him to stop and put his hands on the hood of the patrol vehicle. Bell repeatedly insisted that he had to urinate, however, and following a patdown, the trooper allowed him to relieve himself along the tree line on the side of the Turnpike. During the patdown, the trooper felt a large wad of cash in Bell's pocket and asked Bell how much money he had. Bell replied that he had about $2,300, some of which belonged to his two passengers. Trooper Overcash then directed Bell to return to his vehicle.

¶ 3 Shortly thereafter, Trooper Overcash approached the passenger side of the vehicle to issue a speeding citation to Bell.

During his interaction with the vehicle's occupants, the trooper saw unrolled "Philly blunt" cigar papers and tobacco spread about the interior of the car. He took no action based on that observation, however, and continued to prepare the speeding citation. Through the passenger's window, the trooper asked for a driver's license. Although someone handed him a license, which he assumed belonged to the driver, the trooper could not recall whether the driver had produced it. The trooper then went back to his patrol car and used the license to prepare the speeding citation.

¶ 4 After completing the citation, Trooper Overcash returned to Bell's car, gave the citation directly to Bell, and explained his rights and obligations concerning the citation and how to respond. Bell acknowledged receipt by checking a box on the citation, and the trooper then told him he was free to go. Before Bell could leave, however, the trooper turned and asked if he would mind answering some questions. Bell agreed and the trooper asked where he had been, how long he had been there, and where he was going. Bell replied that he had been in Philadelphia intending to stay the weekend but had car trouble and could not pay for a hotel room so decided to return to Pittsburgh. Trooper Overcash found Bell's financial straits suspicious given his earlier discovery of a large wad of cash in his pocket. The trooper also observed that Bell appeared "extremely nervous" during the discussion, that his lips were shaking and that he was speaking very rapidly. The trooper then asked whether Bell had anything illegal in the car and if he could conduct a search. Bell consented to the search and Trooper Overcash returned to his own car to prepare a consent-to-search form. When the trooper returned, however, Bell told him that he had changed his mind because he was in a hurry and wanted to go. Nevertheless, the trooper continued to question Bell about the money in his pocket and asked the passengers if any of it belonged to them. Linnen–Fuqua claimed none of it, and Appellant claimed only $100.

¶ 5 At that point, Trooper Overcash saw a glass vial on the driver's seat that appeared to contain crushed vegetable matter. The trooper took the vial from the car and smelled its contents but could not identify the odor, although he suspected it was marijuana. He asked the vehicle's occupants if they had any knowledge of the vial, and all three professed ignorance. Trooper Overcash then handcuffed the three men with the intent of holding them until he could determine what the substance was. While the men remained handcuffed, he searched each of them in a manner he described as "more than a patdown." He discovered ten vials in Appellant's right front pocket that contained vegetable matter like that in the first vial. He also discovered that the money in Bell's pocket was separated into bundles of $70 each. The trooper then transported all three men to the state police barracks and conducted strip searches, finding seven more vials in Appellant's crotch. Later laboratory testing showed that the vials contained crushed mint leaves treated with phencyclidine (PCP).

¶ 6 The Commonwealth charged Appellant with one count of simple possession and the matter proceeded in Cumberland County before the Honorable Edward E. Guido. Appellant filed a suppression motion, asserting that Trooper Overcash detained him unlawfully, without reasonable suspicion, following his observation of the vial in the driver's seat. Following an evidentiary hearing at which Trooper Overcash testified, Judge Guido denied Appellant's motion. Following a later bench trial, Judge Guido convicted Appellant as charged and imposed a sentence of time served to six months incarceration and

granted immediate parole. Appellant filed this appeal, raising the following questions for our review:

I. Did the trial court err when it refused to suppress evidence obtained from [Appellant]'s person, and from the vehicle, as a result of a second illegal detention conducted after and initial, proper traffic stop?

II. Did the court err in finding that the trooper had probable cause to arrest [Appellant] when there was no probable cause to believe he had possession, or constructive possession, of a controlled substance found inside the vehicle?

Appellant's brief, at 5.

█ ¶ 7 Appellant argues that Trooper Overcash unlawfully detained and searched him after concluding a routine traffic stop of the vehicle in which he was riding and conducted an unlawful arrest based on observations he made during the stop. Both of Appellant's questions challenge the trial court's refusal to suppress evidence. In considering the denial of a suppression motion, our standard of review is well settled. We must "determine whether the record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from these findings." *Commonwealth v. Ayala*, 791 A.2d 1202, 1207 (Pa.Super.2002). In doing so, we "may consider only the prosecution's [evidence]" and the defendant's evidence to the extent it is not contradictory. *Id.*, 791 A.2d at 1207. If the evidence presented at the suppression hearing supports these findings of fact, we may not reverse the lower court unless its accompanying legal conclusions are in error. *See Commonwealth v. Lohr*, 715 A.2d 459, 461 (Pa.Super.1998).

¶ 8 Appellant first argues that the suppression court erred when it refused to suppress evidence found on his person and in the vehicle. He asserts that Trooper Overcash detained him without reasonable suspicion and, therefore, acted illegally in seizing contraband from his person. Appellant's brief, at 11. Although Appellant concedes the legality of the initial traffic stop, he argues that Trooper Overcash had concluded that stop and that his continued questioning required a renewed demonstration of reasonable suspicion not substantiated by the facts at issue. Appellant's brief, at 12.

¶ 9 Regarding citizen/police interactions during traffic stops, in *Commonwealth v. By*, 812 A.2d 1250 (Pa.Super.2002), we stated:

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures, thereby ensuring the "right of each individual to be let alone." *Schneckloth v. Bustamonte*, 412 U.S. 218, 236, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Commonwealth v. Blair*, 394 Pa.Super. 207, 575 A.2d 593, 596 (Pa.Super.1990). Specifically, police officers may not conduct a warrantless search or seizure unless one of several recognized exceptions applies. *See Schneckloth*, 412 U.S. at 219[, 93 S.Ct. 2041]; *Blair*, 575 A.2d at 596–97. One such exception is a search conducted pursuant to consent voluntarily given. *See Blair*, 575 A.2d at 597 (citation omitted). The Fourth Amendment inquiries in consent cases entail a two-prong assessment: first, the constitutional validity of the citizen/police encounter giving rise to the consent and, second, the voluntariness of said consent. *See Commonwealth v. Strickler*, 563 Pa. 47, 757 A.2d 884, 888 (2000) (citation omitted). Where the underlying encounter is found to be lawful, voluntariness be-

comes the exclusive focus. *See id.*, 757 A.2d at 889 (citation omitted). If a defendant's initial detention violates the Fourth Amendment, then any evidence seized during that stop must be excluded as fruit of an unlawful detention absent a demonstration by the government both of a sufficient break in the causal chain between the illegal detention and the seizure of evidence, thus assuring that the search is not an exploitation of the prior illegality, and of voluntariness. *See id.*, 757 A.2d at 889 (citation omitted).

To secure the right of citizens to be free from such intrusions, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens as those interactions become more intrusive. *See Commonwealth v. Key*, 2001 PA Super 375, 789 A.2d 282, 288 (Pa.Super.2001) (citation omitted).

The first of these interactions is a "mere encounter," or request for information, which need not be supported by any level of suspicion, but carries no official compulsion to stop or respond. *See Strickler*, 757 A.2d at 889. The second level is an "investigative detention," or *Terry* stop, which must be supported by reasonable and articulated suspicion that the person seized is engaged in criminal activity, and the detention may continue only so long as is necessary to confirm or dispel such suspicion. *See id.*, 757 A.2d at 889. It subjects a suspect to a stop and period of detention but does not involve such coercive conditions as to constitute the functional equivalent of arrest. *See id.*, 757 A.2d at 889. Finally, an arrest or "custodial detention" must be supported by probable cause. *See id.*, 757 A.2d at 889. To guide the crucial inquiry as to whether or not a seizure has been effect-

ed, the United States Supreme Court has devised an objective test entailing a determination of whether, in viewing the totality of the circumstances, a reasonable person would have believed that he was free to leave. *See id.*, 757 A.2d at 889 (citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen's movement has in some way been restrained.[1] *See id.*, 757 A.2d at 889 (citing *Mendenhall*, 446 U.S. at 553[, 100 S.Ct. 1870]).

In *Strickler* and its companion case, *Commonwealth v. Freeman*, 563 Pa. 82, 757 A.2d 903 (2000), our Supreme Court has used these principles regarding seizure to examine a subsequent citizen/police interaction following a valid traffic stop. In these cases, the Court recognized that "the transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred." *Strickler*, 757 A.2d at 892 (citation omitted). Although there may be no question regarding the validity of the initial traffic stop, the crucial question is when the validity of that stop ceased. *See id.*, 757 A.2d at 891.

Where the purpose of an initial, valid traffic stop has ended and a reasonable person would have believed that he was free to leave, the law characterizes a subsequent round of questioning by the officer as a mere encounter. *See Strickler*, 757 A.2d at 898. Since the citizen is free to leave, he is not detained, and the police are free to ask questions appropriate to a mere encounter, including a request for permission to search the vehicle. However, where the purpose of an initial traffic stop has ended and a

reasonable person would not have believed that he was free to leave, the law characterizes a subsequent round of questioning by the police as an investigative detention or arrest. *See Freeman,* 757 A.2d at 907. In the absence of either reasonable suspicion to support the investigative detention or probable cause to support the arrest, the citizen is considered unlawfully detained. Where a consensual search has been preceded by an unlawful detention, the exclusionary rule requires suppression of the evidence obtained absent a demonstration by the commonwealth both of a sufficient break in the causal chain between the illegality and the seizure of evidence. This assures of the search's voluntariness and that the search is not an exploitation of the prior unlawful detention. *See Strickler,* 757 A.2d at 889 (citation omitted).

1  In *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the United States Supreme Court explained that there is no "litmus-paper" test for distinguishing a mere encounter from a seizure as follows:

The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to "leave" will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

*Royer,* 460 U.S. at 506, 103 S.Ct. at 1329. *By,* 812 A.2d at 1254–56.

¶ 10 In this case, Appellant does not challenge the constitutionality of Trooper Overcash's decision to stop the vehicle.[1] He challenges the subsequent detention after the valid traffic stop. Appellant contends that Trooper Overcash's detention of Ap-

pellant was without any additional reasonable suspicion, and, thus, the evidence obtained should be suppressed.

¶ 11 The first citizen/police interaction ended when Trooper Overcash returned to Bell his driving documents, issued him the citation for speeding and informed him that he was free to leave. A second citizen/police interaction began when Trooper Overcash continued to question Bell and thereby prohibited Appellant and his companions from leaving. *See Commonwealth v. Freeman,* 563 Pa. 82, 757 A.2d 903, 907 (2000) (finding traffic stop concluded when officer returned motorist's documents and told her that she free to leave). We must analyze the characteristics of the second interaction to determine the legality of Trooper Overcash's subsequent detention of Appellant. *See Commonwealth v. Ortiz,* 786 A.2d 261, 265 (Pa.Super.2001), *appeal denied,* 568 Pa. 717, 797 A.2d 912 (2002), (reaffirming that citizen/police interaction following valid traffic stop "must be analyzed anew to determine whether it amounts to a constitutionally valid seizure . . . .").

¶ 12 To secure the right of citizens to be free from unreasonable search and seizure and unlawful arrest, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty. *See Commonwealth v. Reppert,* 814 A.2d 1196, 1201 (Pa.Super.2002) (*en banc*). For this purpose, our Supreme Court has defined three forms of interaction: "a mere encounter, an [investigative] detention, and a custodial detention." *Id.,* 814 A.2d at 1201. A mere encounter is characterized by limited

1.  Nor would it appear that such an argument could be sustained. Trooper Overcash cited the driver of the vehicle for exceeding the speed limit in violation of 75 Pa.C.S.A. § 3362.

police presence and police conduct and questions that are not suggestive of coercion. *See id.*, 814 A.2d at 1201. Such encounters do not obligate the citizen to stop or respond and, consequently, need not be supported by any level of suspicion. *See id.*, 814 A.2d at 1201. If, however, a police presence becomes too intrusive, the interaction must be deemed an investigative detention or seizure. *See id.*, 814 A.2d at 1201.

> To decide whether a seizure has occurred, a court must consider all the circumstances surrounding the encounter to determine whether the demeanor and conduct of the police would have communicated to a reasonable person that he or she was not free to decline the officer's request or otherwise terminate the encounter. Thus, the focal point of our inquiry must be whether, considering the circumstances surrounding the incident, a reasonable [person] innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes.

*Id.*, 814 A.2d at 1201–1202. Accordingly, "[w]here the purpose of an initial traffic stop has ended and a reasonable person would not have believed that he was free to leave, the law characterizes a subsequent round of questioning by the police as an investigative detention or arrest." *Commonwealth v. Dales*, 820 A.2d 807, 813 (Pa.Super.2003) (quoting *By*, 812 A.2d at 1255).

■ ¶ 13 Upon review of the record at issue here, we conclude that Trooper Overcash's subsequent interaction with Appellant, Bell and the other passenger culminated in an investigative detention. In so finding, we acknowledge that initially, the trooper's questions were innocuous and neither his actions and demeanor nor other circumstances evinced so coercive a police presence as to constitute a seizure. Argu-

ably, even the trooper's request to search the car did not escalate the nature of the interaction. *See By*, 812 A.2d at 1256 (citing *Strickler*, 757 A.2d at 898) (when purpose of valid traffic stop ended and reasonable person would believe free to leave, subsequent round of questioning is mere encounter). *But see Dales*, 820 A.2d at 812 n. 1 (quoting *Commonwealth v. Zogby*, 455 Pa.Super. 621, 689 A.2d 280, 282 (1997) (recognizing that "unless told they have a right to decline, most individuals are not likely to perceive a request from a police officer as allowing for a choice")).

¶ 14 Nevertheless, Trooper Overcash escalated the encounter when, after Bell's initial consent to a vehicle search, Bell changed his mind and said he was in a hurry and wanted to go. Although Trooper Overcash did not expressly refuse Bell's apparent request to leave, the trooper continued questioning Bell, inquiring specifically about the money he had felt in Bell's pocket during the initial patdown. Given the deference that most citizens typically accord police officers in recognition of the officers' legal authority, we conclude that a "reasonable [person] innocent of any crime," would not have felt free simply to drive away, regardless of how strong his desire. *See Freeman*, 757 A.2d at 907. We find that Trooper Overcash's continued questioning at that point vitiated his prior statement releasing Bell and his passengers to go and constituted an investigative detention. *See id.*, 757 A.2d at 907–908 (concluding that police inquiries inconsistent with officer's earlier advice that defendant was free to depart "would have suggested to a reasonable person that such advice was no longer operative").

■ ¶ 15 To conduct an investigative detention, a law enforcement officer "must harbor at least a reasonable suspicion that the person seized is then engaged in unlawful activity." *Reppert*, 814 A.2d at

1203. Reasonable suspicion exists only where the officer is able to articulate "specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity." *Id.,* 814 A.2d at 1204. "Therefore, the fundamental inquiry of a reviewing court must be an objective one, 'namely, whether the facts available to the officer at the moment of [intrusion] warrant a man of reasonable caution in the belief that the action taken was appropriate.'" *Id.* (*quoting Commonwealth v. Zhahir,* 561 Pa. 545, 751 A.2d 1153, 1156 (2000) (insertion in *Zhahir*)).

¶ 16 Where, as here, the detention at issue follows a prior valid traffic stop, an arresting officer must demonstrate cause for suspicion **after** the end of the initial stop independent of any basis on which he conducted that stop. *See Ortiz,* 786 A.2d at 266 ("Without existence of a reasonable suspicion after the first encounter had ended, the second detention was unlawful"). Thus, in *Ortiz,* we recognized that even where a defendant's conduct during the initial stop "may have merited further inquiry," the arresting officer's instruction to the defendant that he was free to leave vitiated any grounds he had to hold the defendant further. *See id.,* 786 A.2d at 266. Absent some new observation of suspicious circumstances, the defendant's continued detention was illegal. *See id.,* 786 A.2d at 266 ("Without the existence of reasonable suspicion after the first encounter had ended, the second detention was unlawful."). *See also Freeman,* 757 A.2d at 908 (finding seizure illegal where arresting officer told defendant she was free to go after initial stop despite suspicion of her conduct and failed to identify

suspicious conduct during subsequent stop).

¶ 17 In this case, the suppression court recognized that Trooper Overcash had concluded the initial stop when he issued the citation, returned the documents and informed the occupants that they were free to leave. *See* Trial Court Opinion, 10/17/02, at 3. The suppression court also recognized that the continuing questioning resulted in a second detention, which, because of its nature, was an investigative detention. *See id.,* at 3–4. Accordingly, the court accepted the following factors as grounds for reasonable suspicion to conclude that Trooper Overcash acted lawfully in detaining Appellant and his companions:

[1.] [Appellant] was the joint owner of a large sum of cash being carried by the driver.

[2.] [Appellant] was an occupant of a vehicle in which Philly blunt papers were strewn throughout.

[3.] The driver was visible nervous when asked if there was anything illegal in the car.

[4.] [The driver] gave inconsistent statements regarding their journey.

[5.] A glass vial containing suspected marijuana was in plain view of the driver's seat.

Trial Court Opinion, 10/17/02, at 4.

¶ 18 Having found, as discussed *infra,* that the detention occurred well before Trooper Overcash observed the vial, the suppression court erred in utilizing Factor 5, *concerning apparent vegetable matter in a glass vial, similar to vials used in the drug trade, in the driver's seat,* in determining that the trooper had reasonable suspicion. The later discovery of the vial cannot be used to justify the prior detention.

¶ 19 Appellant argues that the suppression court erred in utilizing Factors 1 and

2 because Trooper Overcash made those observations prior to the conclusion of the initial stop and advising Bell that he and his passengers were free to leave. Appellant relies on *Commonwealth v. Freeman*, 563 Pa. 82, 757 A.2d 903 (2000), and *Commonwealth v. Ortiz*, 786 A.2d 261 (Pa.Super.2001), to argue that because these factors were made *prior* to the occupants of the vehicle being told that they were free to leave, the trial court was prohibited from using these factors to determine a reasonable basis existed for suspecting criminal activity.

■ ¶ 20 Our Supreme Court recognized in *Freeman*, and as we applied in *Ortiz*, reasonable suspicion of criminal activity during a subsequent stop must be derived from observations made *after* the conclusion of the first stop. *See Freeman*, 757 A.2d at 908; *see also Ortiz*, 786 A.2d at 266. Because Trooper Overcash knew of the large amount of money and the "Philly blunt" papers before he told Bell he could go, we do not find those factors alone constitute a cognizable basis on which to conduct the subsequent stop. If Trooper Overcash had not made any further observations, then *Freeman* would require suppression of the evidence. However, the suppression court recognized two more factors that Trooper Overcash relied upon, and these observations occurred *after* the initial stop had concluded.

¶ 21 Trooper Overcash noted Bell's nervousness when asked if there was anything illegal in the car and the driver's "inconsistent" statements concerning his trip. These observations, on their own, may not constitute a lawful basis for investigative detention. *See Reppert*, 814 A.2d at 1206 (finding nervous demeanor and furtive movement insufficient basis for investigative detention).

¶ 22 However, when Factors 3 and 4 are combined with Factors 1 and 2, we find that Trooper Overcash had a reasonable basis for investigative detention of the occupants, including Appellant. In *Freeman*, and in *Ortiz*, a second encounter occurred after the police determined that no reasonable suspicion existed to justify a detention and therefore, the defendant was free to go. *See Freeman*, 757 A.2d at 908; *see also Ortiz*, 786 A.2d at 266. This scenario was best summarized:

> While Ortiz's behavior during the initial investigative detention may have merited further inquiry to determine if his anxiety was due to illegal conduct, nothing happened *after* the conclusion of the initial stop to provide Officer Baur further cause for suspicion. Without the existence of a reasonable suspicion after the first encounter had ended, the second detention was unlawful.

*See Ortiz*, 786 A.2d at 266 (citation omitted).

■ ¶ 23 However, the events of this case can be distinguished from *Freeman* and *Ortiz* because Trooper Overcash made observations *after* the conclusion of the initial stop. He observed Bell become extremely nervous when being questioned about whether the vehicle contained any contraband. Trooper Overcash also listened to Bell's story about being forced to leave Philadelphia because he and his companions did not have enough money for a hotel room for the evening. However, this story conflicted with Trooper Overcash's finding that the group had $2,300.00. So, unlike *Freeman* and *Ortiz*, additional observations were made *after* the initial stop had concluded. Because observations were made after the initial stop, the trial court was correct in viewing the total circumstances, *i.e.*, what had happened prior to and after the initial encounter, in determining whether reasonable suspicion existed at the time of the detention because, "The question of whether reasonable sus-

picion existed at the time of a detention must be answered by examining the totality of circumstances to determine whether there was a particularized and objective basis for suspecting the detainee of criminal activity." *Freeman*, 757 A.2d at 908. Given that a court must examine "the totality of the circumstances," we find that the suppression court did not err in examining Trooper Overcash's observations from prior to the second detention because nothing in the language of *Freeman* or *Ortiz* expressly or implicitly limits the totality of the circumstances to those observations occurring only *after* the initial encounter had ended.

¶ 24 Therefore, under the totality of the circumstances, specifically, factors 1–4 upon which the trial court relied, we find that Trooper Overcash had a reasonable suspicion of criminal activity and that the detention of the vehicle's occupants, including Appellant, was lawful.[2]

¶ 25 Appellant's second issue on appeal is that the suppression court erred in finding that Trooper Overcash had probable cause to arrest Appellant because the trooper did not have probable cause to believe that Appellant possessed, or constructively possessed, the glass vial found on the driver's seat.

■■■ ¶ 26 Probable cause to arrest exists when the facts and circumstances within the police officer's knowledge and of which the officer has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable

caution in the belief that an offense has been committed by the person to be arrested. *See Commonwealth v. Gwynn,* 555 Pa. 86, 723 A.2d 143, 148 (1999) (citations omitted).

■■■ ¶ 27 The record reflects Trooper Overcash observed: Appellant was a passenger in a vehicle in which "Philly blunt" papers were in the front seat; on Bell's person was a large amount of cash, some of which belonged to Appellant; Bell acted nervous when asked if their was contraband in the vehicle; and a glass vial of a suspected controlled substance was found in the driver's seat, with no passenger in the vehicle admitting to possessing the vial. Trooper Overcash used these observations and determined that the passengers may be involved in illegal activity. Accordingly, we find that the suppression court did not err in finding that Trooper Overcash possessed a reasonable belief based upon trustworthy information to lead him to the conclusion that Appellant had committed a criminal act.

¶ 28 Having found that the suppression court did not err in failing to suppress the evidence, we affirm the judgment of sentence.

¶ 29 Judgment of sentence affirmed.

¶ 30 JOHNSON, J., files a Dissenting Opinion.

JOHNSON, J., Dissenting.

¶ 1 I respectfully dissent. The Majority determines that Trooper Overcash had

---

2. In *Reppert,* we stated that to conduct an investigative detention, an officer "must harbor at least a reasonable suspicion that the person seized is engaged in unlawful activity." *Reppert,* 814 A.2d at 1203. At first glance, Factors 3 and 4 only relate to the conduct of Bell, and, therefore, one could conclude that only Bell could be detained. However, the totality of the circumstances conclude otherwise: Bell was visibly nervous when asked whether the vehicle contained any contraband, Bell gave conflicting stories about their travels, the vehicle had "Philly blunt" papers strewn about, and Appellant admitted to being part owner of a large amount of cash (and yet Appellant and his companions were unable to afford a hotel in Philadelphia). These circumstances led to a lawful detention of Appellant.

reasonable suspicion to conduct an investigative detention of Kwasi Johnson and concludes accordingly that the trial court did not err in refusing to suppress evidence of contraband the trooper seized from Johnson's person. In support of this conclusion, the Majority reasons that Trooper Overcash was legally entitled to rely on observations made during a routine traffic stop that concluded prior to the beginning of the encounter at issue here. I find nothing in the case law the Majority cites that compels or even allows such a process. Moreover, I find Trooper Overcash's observations during the second encounter insufficient to detain this defendant.

¶ 2 Where, as here, the detention at issue follows a prior valid traffic stop, an arresting officer must demonstrate cause for suspicion *after* the end of the initial stop independent of any basis on which he conducted that stop. *See Commonwealth v. Ortiz,* 786 A.2d 261, 266 (Pa.Super.2001). Thus, in *Ortiz,* we recognized that even where a defendant's conduct during the initial stop "may have merited further inquiry," the arresting officer's instruction to the defendant that he was free to leave vitiated any grounds he had to hold the defendant further. *See id.* Absent some new observation of suspicious circumstances, the defendant's continued detention was illegal. *See id.* ("Without the existence of a reasonable suspicion after the first encounter had ended, the second detention was unlawful."). *See also Commonwealth v. Freeman,* 563 Pa. 82, 757 A.2d 903, 908 (2000) (finding seizure illegal where arresting officer told defendant she was free to go after initial stop and failed to identify suspicious conduct during subsequent stop).

¶ 3 In this case, the Majority interprets *Freeman* and *Ortiz* to allow an officer effectively to combine his observations during the second encounter with his observations during the first in order to formulate reasonable suspicion to conduct a seizure. I find nothing in either *Freeman* or *Ortiz* that counsels such a result. Indeed, in *Ortiz,* we carefully enunciated that notwithstanding an officer's observations or suspicion during the first encounter, renewed detention after that encounter has ended must be supported by *new suspicion* and *new observations. See Ortiz,* 786 A.2d at 266 (reasoning that "[w]hile Ortiz's behavior during the initial investigative detention may have merited further inquiry to determine if his anxiety was due to illegal conduct, nothing happened **after** the conclusion of the initial stop to provide Officer Baur further cause for suspicion.") (original emphasis). In accordance with this rationale, the "conclusion of the initial stop" is significant, in part, because it forecloses the ability of the detaining officer to hold a citizen on the basis of observations he made, but on which he did not act in a timely manner. *See id.* at 265. I fail to discern, how, when an officer has observed circumstances he chooses not to investigate during an initial stop, he may then be entitled to cite those very circumstances to support a subsequent detention. In my view, *Ortiz* requires that any observations after the "conclusion of the initial stop" must stand independently to support a subsequent stop.

¶ 4 Having considered the totality of circumstances following the "conclusion of the initial stop," I cannot conclude that Trooper Overcash's observations are sufficient to establish grounds for detention. Here, Trooper Overcash relied on the driver's nervousness when asked if there was anything illegal in the car and his "inconsistent" statements concerning the trip that he, Johnson, and Linnen–Fuqua were making from Philadelphia. This Court has held expressly that a citizen's nervous demeanor, even when combined with related

factors, does not constitute a lawful basis for investigative detention. *See Commonwealth v. Reppert*, 814 A.2d 1196, 1206 (Pa.Super.2002) (en banc) (finding nervous demeanor and furtive movements insufficient basis for investigative detention); *see also Commonwealth v. Sierra*, 555 Pa. 170, 723 A.2d 644, 647 (1999) (plurality opinion) (finding nervous demeanor insufficient basis for detention even when combined with suspicion that the defendant had stolen motorcycle parts in the back of the car stopped); *Commonwealth v. DeHart*, 745 A.2d 633, 638 (Pa.Super.2000). I find no material difference between the conduct observed in those cases and the conduct observed here after the conclusion of the initial stop. In this case, Trooper Overcash saw that the driver of the car (not Johnson) told a questionable story concerning the trio's inability to afford a hotel in Philadelphia and appeared very nervous as he did so. Thus, as in the cases cited above, the detaining officer observed little objective conduct and relied instead on a subjective interpretation of the citizen's manner and bearing and his response to the stress of police interaction. As we observed in *Reppert*, such "observations" establish "nothing more than a 'hunch' employing speculation about the citizen's motive in the place of fact." 814 A.2d at 1206. Such speculation is not sufficient basis upon which to conduct a lawful seizure. *See id.*

¶ 5 Therefore, I respectfully dissent.