J-A12037-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| BRANDON T. SCHONFELD, | |
| Appellant | No. 390 EDA 2015 |

Appeal from the Judgment of Sentence December 9, 2014
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0007738-2013

BEFORE:  BENDER, P.J.E., PANELLA, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:          **FILED AUGUST 24, 2016**

Brandon T. Schonfeld ("Appellant") appeals from the judgment of sentence entered by the Court of Common Pleas of Delaware County after a jury convicted him of Possession with Intent to Deliver a Controlled Substance (Cocaine) ("PWID"), Aggravated Assault, Assault of Law Enforcement Officer, Firearms Not to be Carried Without a License, and a later finding of guilt as to Persons Not to Possess, Use, Manufacture, Control, Sell or Transfer Firearms.[1]  Sentenced to an aggregate term of incarceration of 31.5 to 63 years, Appellant challenges the validity of his seizure, an evidentiary ruling of the court, and the trial court's jurisdiction to bifurcate a criminal trial with respect to the Persons Not to Possess charge.  We affirm.

---

[1] 35 P.S. 780-113(a)(30), 18 P.S. § 2702(a)(6), 18 P.S. § 2702.1(a), 18 P.S. § 6106(a)(1), 18 P.S. § 6105(a)(1), respectively.

*Former Justice specially assigned to the Superior Court.

The trial court aptly summarizes the factual and procedural histories of the case as follows:

On September 9, 2013, at approximately 3:15 p.m., Police Officers from Sharon Hill Police Department arrested and charged the Defendant, Brandon Schonfeld, with [the above-referenced charges].

Officer Sean Johnson, a four and one-half year veteran with the Sharon Hill Police Department, testified that he was on duty on September 9, 2013, during the day-shift. (N.T. 10/21/14 at 164). He was in uniform and working in a stationary marked patrol vehicle while he monitored the flow of traffic, eastbound and westbound, on Chester Pike in the Borough of Sharon Hill, Delaware County, Pennsylvania. (N.T. at 165-66). Specifically, the Officer stated that he was located in the 1400 block of Chester Pike where he was parked in a parking lot. (N.T. at 166).

While monitoring traffic from the Family Dollar parking lot, Officer Johnson observed a white, four-door Nissan Altima with windows tinted "so dark that [he] couldn't see inside of the vehicle." (N.T. 3/11/14 at 12, 13); (N.T. 10/21/14 at 166). The Officer continued: the window tint was "so dark that [I] couldn't see inside to how many occupants were in the vehicle." (N.T. 3/11/14 at 13).

The Officer also testified that the white vehicle appeared to be driving faster than the traffic that was driving in front of him. (N.T. 3/11/14 at 12-13). The speed limit along the relevant part of Chester Pike is 35 MPH. Officer Johnson testified that he believed the vehicle was driving in excess of 35 MPH. (N.T. 3/11/14 at 16). The Officer testified that he felt the Defendant was not driving at a safe and appropriate speed "because of the time of day, 3:30 in the afternoon on a Monday, school was still in session, and it was a nice day so there [were] people out walking an unfortunately in Sharon Hill people don't use the crosswalks and they tend to cross the street in the middle of Chester Pike." (N.T. at 88).

Officer Johnson then exited the parking lot. (N.T. at 13). The Officer proceeded to get behind the vehicle. (N.T. at 13). While

behind the vehicle at a red light, the Officer testified, he could not see a registration sticker displayed on the registration plate. The Officer ran the license plate number through the mobile data terminal (MDT) but no record was found for that license plate number. (N.T. at 13, 14, 60). The Officer clarified that no record was found because the license plate "was in temporary tag status, which means that it was recently bought and it has not yet been transferred from the dealer to the owner." Officer Johnson testified that the rear window of the vehicle was tinted such a dark color that he was unable to see the temporary registration that is supposed to be affixed to the back window of the vehicle. (N.T. at 15). Officer Johnson also testified that the driver of the vehicle pulled up close to the vehicle in front of him, when the traffic light turned green. (N.T. at 62).

Officer Johnson then activated his emergency lights and sirens. Once the vehicle pulled over to the right, the Officer conducted a traffic stop in the 1000 block of Chester Pike. (N.T. at 15, 17). The Officer testified that the patrol car video-camera was functioning at the time of the traffic stop. (N.T. 10/21/14 at 210).[fn] [see also N.T. 3/11/14 at 37 et seq.]. The Officer exited his vehicle and then made contact[fn]

---

[fn]The video from the in-dash camera was played for the jury and admitted into evidence as C-63 without objection. (N.T. 10/21/14 at 210).

---

with the driver, the Defendant in this case. Officer Johnson testified that he could not see inside the vehicle until he was standing at the driver-side door because the driver-side window was rolled about halfway down at that point. (N.T. 3/11/14 at 17-18).

When the Officer approached the vehicle, he requested the driver's license, registration, and insurance. (N.T. at 18). The Defendant provided his driver's license, the temporary registration paper, and his proof of insurance. (N.T. at 19). With those documents in his hand, the MVR video showed the Officer looking into the driver-side window and pointing to the rear window because he could now see the temporary registration sticker from the inside of the vehicle. (N.T. at 43).

After receiving these documents, Officer Johnson returned to his patrol vehicle to review the insurance information and temporary registration paper. The Officer testified that he confirmed the fact that the registration was in temporary status and there were no questions about the status of the registration. (N.T. at 69). Additionally, the Officer ran the Defendant's driver's license through the MDT and NCIC to see if the driver's license was suspended or if the Defendant had any wants or warrants. (N.T. at 19). The Officer testified that the Defendant had a valid license with no wants or warrants on him. (N.T. at 19-20).

Officer Johnson then exited his patrol vehicle and began to approach the driver's side of the Defendant's vehicle. As the Officer was approaching the vehicle, the Officer could see the Defendant looking at him in the side-view mirror on the driver's side of the vehicle. (N.T. at 20,21). The Officer testified that this eye contact concerned him. He explained that he was concerned because he learned from a street survival school, which deals with officers who have been shot in the line of duty, that a red flag is "if someone keeps making eye contact with you or they keep wanting to know where you are, they will keep looking in the rearview mirror, and in the side view mirrors." (N.T. at 22).

While approaching the vehicle, the Officer also observed the Defendant moving around the driver's compartment of the vehicle. The Officer further clarified the Defendant's movement as "movement towards the right side of the driver's compartment. The shoulder dipped and it was towards the right side of the driver's compartment." (N.T. at 20). Officer Johnson testified that such movement was an officer safety concern because "[y]ou are taught that if you can't see their hands, the hands are what is going to kill you. The issue is going to be in the hands and you need to see the hands, and his hands were obviously moving around the driver's compartment." (N.T. at 21).

The Officer then made contact with the Defendant for the second time. (N.T. at 20). Officer Johnson testified that the Defendant provided a description of his route that was inconsistent with what the Officer had observed. (N.T. at 22). The Officer explained that the Defendant stated that he was coming up Sharon Avenue before he turned onto Chester Pike. (N.T. at 22). However, the Officer observed the Defendant on Chester

Pike and was following the Defendant on Chester Pike when the two of them passed the intersection of Sharon Avenue and Chester Pike. (N.T. at 23).

Officer Johnson testified that he then advised the Defendant to slow down due to the time of day. Officer Johnson also advised the Defendant about the window tint on the windows. Finally, the Officer advised the Defendant that he was not giving the Defendant a citation for either of his violations. (N.T. at 20). Officer Johnson then returned the Defendant's driver's license, temporary registration paper, and insurance information to him. After returning the documents to the Defendant, the Officer told the Defendant that he was free to leave. (N.T. at 24).

After informing the Defendant that he was free to leave, Officer Johnson asked the Defendant if there were any weapons or narcotics in the vehicle. The Defendant stated that there were no weapons or narcotics in the vehicle and removed his seatbelt. At that point, Officer Johnson asked the Defendant what he was doing. The Defendant responded that he thought the Officer was going to ask the Defendant to get out. The Officer asked, "Why would you think that[?]" (N.T. at 47).

At this point, the Officer testified that he was in fear due to the fact that the Defendant's hands were out of sight and he made another movement towards the center console area. The MVR depicts that the Officer briefly placed his hand on the butt of his handgun. (N.T. at 47-48). Then, the Officer requested the Defendant to step out of the vehicle "for officer safety, so a pat-down for weapons could be performed." (N.T. at 47). The Defendant abruptly opened the door and struck Officer Johnson. (N.T. at 25). The Defendant then exited the vehicle, with a cigarette in his mouth and his documents in his left hand, and began to walk towards the front of the vehicle. (N.T. at 25, 27). Officer Johnson grabbed the back of the Defendant's shirt and guided him to the rear of the Defendant's vehicle because Chester Pike is a busy street. (N.T. at 24, 25).

When the Defendant arrived at the rear of his vehicle, Officer Johnson requested the Defendant to place both his hands on the trunk of his vehicle so the Officer could conduct a pat-down. (N.T. at 28). During the pat-down, the Defendant was positioned away from the Officer with his feet spread and hands on the trunk. Officer Johnson requested the Defendant to keep

his hands on the trunk of the vehicle but he picked his hands up numerous times, including once to flick his cigarette into Chester Pike. (N.T. at 31).

As the Officer began his pat-down, he felt a hard bulge on the right side of the Defendant's body near his waistband area. At this point, the Officer believed it was a firearm. (N.T. at 29). As the Officer moved his hand down the inside of the Defendant's leg towards the outside of his pocket area, the Officer felt what he believed to be a large amount of United States currency. (N.T. at 29). Then, the Officer removed his handcuffs and attempted to handcuff the Defendant's right hand because that was the side that the Officer believed the firearm was on. (N.T. at 31). Because the hinge part of the handcuff of the handcuff hit the trunk lid and bounced back, the Officer was not able to secure the handcuff on the Defendant's right hand. (N.T. at 31-32). At that time, the Defendant attempted to elbow the Officer with his right elbow and swing his body around while saying, "Why the fuck are you trying to arrest me[?]" (N.T. at 32). Officer Johnson then punched the Defendant twice in the side of the head. The Defendant stumbled to the ground and took off on a diagonal northern path towards Barker Avenue. Officer Johnson then ran alongside the Defendant's vehicle and took a wider path towards Barker Avenue. (N.T. at 32).

As he was running, the Officer testified that he was relaying to his dispatch a physical description of the Defendant, the Defendant's direction of travel, and that the Defendant was reaching for something in his waistband in the same area where the Officer had believed he felt a handgun during the pat-down. (N.T. at 32-33).

Officer Johnson testified that he saw the Defendant make a sharp turn up Barker Avenue heading north. The Officer took a wide turn onto Barker Avenue and observed the Defendant hunched over in the middle of the street. The Officer testified that the Defendant was reaching for something between his legs while looking back at the Officer. Officer Johnson testified that he saw a black object between the Defendant's legs which he knew was "in fact a firearm, there was no doubt about it." (N.T. at 33).

Officer Johnson's firearm was out of its holster and pointing in the Appellant's direction. Officer Johnson testified that he gave

the Appellant verbal commands to drop the gun and to get on the ground. The Appellant did not respond to those commands. Instead, he turned around and pointed his firearm at the Officer. Officer Johnson testified that the Appellant's firearm had a light on the bottom of the rail that was illuminated with a bright white light. (N.T. at 33). The bright white light was pointed "directly at [the Officer]." (N.T. at 33-34). The Officer continued to give verbal commands to drop the weapon and get on the ground. After the Defendant refused to follow the commands, the Officer shot at the Defendant with his weapon[, emptying three clips.] (N.T. at 34-35, 79-80).

After Officer Johnson fired the gun, the Defendant and the Officer continued on the northern path up Barker Avenue "zigzagging in the street, going from one side to the other." (N.T. at 35). At about mid-block, the Defendant fell to the ground and dropped the firearm onto the street. The Officer shot and hit the Defendant in his lower torso in the back. (N.T. 10/21/14 at 192). The Defendant got up off of the ground, picked up the firearm, and continued north on Barker Avenue past Marshall Road. Officer Johnson testified that this was the last time that he saw the Defendant that afternoon. (N.T. 3/11/14 at 35).

\*\*\*

On January 6, 2014, Criminal Informations were filed against the Appellant. On February 24, 2014, Appellant filed a Motion to Suppress Evidence and a Suppression Hearing was held on March 11, 2014. The Appellant's Memorandum of Law in Support of the Suppression Motion was filed April 14, 2014 and the Commonwealth's Suppression Memorandum of Law was filed on April 28, 2014. On May 6, 2014, [the suppression court] denied the Motion and issued [] Findings of Fact and Conclusions of Law….

\*\*\*

On October 21, 2014, a Jury Trial commenced. On October 24, 2014, the Jury found Appellant Guilty of: Possession With Intent to Deliver a Controlled Substance (Cocaine), Aggravated Assault, Assault of Law Enforcement Officer, Firearms Not to be Carried Without a License, and a later finding of Guilt as to Persons Not to Possess, Use, Manufacture, Control, Sell or Transfer Firearms. Prior to sentencing, this Court ordered a Pre-Sentence

Investigation, as well as a Psychological Evaluation and Drug and Alcohol Evaluation.

On December 9, 2014, Appellant was sentenced [to an aggregate 31.5 to 63 years in SCI]. (N.T. 12/9/14 pp. 33-34).

On December 16, 2014, the Appellant filed Post-Sentence Motions and they were denied on January 9, 2015. On February 6, 2015, Appellant filed a timely Notice of Appeal. Consequently, on February 9, 2015, this Court directed Appellant to file a Concise Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(b).

Trial Court Opinion, filed June 5, 2015, at 1-10.

Appellant presents the following three issues for our review:

I.    May Officer Johnson intentionally create a permissible reengagement, understanding that the first seizure in the form of a traffic stop provided no reasons to detain, when the dash cam video shows that the purported reason for the second seizure, a furtive movement that prompted Officer Johnson to handle his gun butt, came after the second seizure?

II.   Does a trial court abuse its discretion when it makes a 404(b) ruling to admit evidence of Appellant's parole status as of the date of the current offense relying on case law that failed to address the facts or the argument here that 404(b) requires the trial court to analyze prior bad acts, not prior status?

III.  Does the trial court have jurisdiction, even with the agreement of counsel, to bifurcate a criminal trial in light of the holding in *Commonwealth v. Valentine*?

Appellant's brief at 9.

In addressing Appellant's challenge to the suppression court's denial of his motion to suppress, we note that our standard of review is well-settled.

- 8 -

With respect to an appeal from the denial of a motion to suppress, our Supreme Court has declared:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing the ruling of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Eichinger*, 915 A.2d 1122, 1134 (Pa. 2007) (internal citations omitted). "Once a motion to suppress evidence has been filed, it is the Commonwealth's burden to prove, by a preponderance of the evidence, that the challenged evidence was not obtained in violation of the defendant's rights." *Commonwealth v. Wallace*, 42 A.3d 1040, 1047–1048 (Pa.Super. 2012) (*en banc*); *see also* Pa.R.Crim.P. 581(H). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Gallagher*, 896 A.2d 583, 585 (Pa.Super. 2006). We may only consider evidence presented at the suppression hearing. *In re L.J.*, 79 A.3d 1073, 1085–87 (Pa. 2013).

"The Fourth Amendment to the [United States] Constitution and Article I, Section 8 of [the Pennsylvania] Constitution protect citizens from unreasonable searches and seizures." *Commonwealth v. McAdoo*, 46

A.3d 781, 784 (Pa.Super. 2012). "A search conducted without a warrant is deemed [] unreasonable and therefore constitutionally impermissible, unless an established exception applies." ***Commonwealth v. Strickler***, 757 A.2d 884, 888 (Pa. 2000).

To safeguard our right to be free from unreasonable searches and seizures, "courts require police to articulate the basis for their interaction with citizens in [three] increasingly intrusive situations." ***McAdoo***, 46 A.3d at 784. Our Supreme Court has categorized these three situations as follows:

> The first category, a mere encounter or request for information, does not need to be supported by any level of suspicion, and does not carry any official compulsion to stop or respond. The second category, an investigative detention, derives from ***Terry v. Ohio***[,392 U.S. 1 (1968)] and its progeny: such a detention is lawful if supported by reasonable suspicion because, although it subjects a suspect to a stop and a period of detention, it does not involve such coercive conditions as to constitute the functional equivalent of an arrest. The final category, the arrest or custodial detention, must be supported by probable cause.

***Commonwealth v. Smith***, 836 A.2d 5, 10 (Pa. 2003).

"To determine if an interaction rises to the level of an investigative detention, *i.e.,* a ***Terry*** stop, the court must examine all the circumstances and determine whether police action would have made a reasonable person believe he was not free to go and was subject to the officer's orders." ***Commonwealth v. Stevenson***, 832 A.2d 1123, 1127 (Pa.Super. 2003). "An investigative detention, unlike a mere encounter, constitutes a seizure of a person and thus activates the protections of Article 1, Section 8 of the

- 10 -

Pennsylvania Constitution." ***Id.*** "Accordingly, where the purpose of an initial traffic stop has ended and a reasonable person would not have believed that he was free to leave, the law characterizes a subsequent round of questioning by the police as an investigative detention or arrest." ***Commonwealth v. Johnson***, 833 A.2d 755, 762 (Pa.Super. 2003), ***overruled on other grounds***, ***Commonwealth v. Kemp***, 961 A.2d 1247, (Pa.Super. 2008) (*en banc*).

Here, the suppression court determined that Officer Johnson commenced a second investigatory detention after telling Appellant he was free to leave when he immediately reengaged Appellant with questions about whether weapons and narcotics were in the vehicle. Decisional law of this Commonwealth supports the court's determination. ***Kemp***, 961 A.2d at 1250-51 (reengagement constituted investigative detention where officer returned license, shook driver's hand, told him "to have a nice day," and allowed him to walk back to driver's side door before asking him if there were any "guns, drugs, or money" inside of vehicle). ***See also Commonwealth v. Jones***, 874 A.2d 108, 117 (Pa.Super. 2005) (holding first citizen/police interaction ended when officer returned identification card and rental agreement to appellant and informed him he was free to leave; second investigative detention ensued when officer then asked for consent to search automobile, thereby prohibiting Appellant from leaving).

Our inquiry, therefore, turns to whether Officer Johnson possessed a reasonable suspicion of weapon or narcotics possession by Appellant.

> A police officer may detain an individual in order to conduct an investigation if that officer reasonably suspects that the individual is engaging in criminal conduct. *Commonwealth v. Cook*, 558 Pa. 50, 735 A.2d 673, 676 (1999). "This standard, less stringent than probable cause, is commonly known as reasonable suspicion." *Id.* In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. *In re D.M.*, 566 Pa. 445, 781 A.2d 1161, 1163 (2001). In making this determination, we must give "due weight ... to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience." *Cook*, 735 A.2d at 676 (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, "even a combination of innocent facts, when taken together, may warrant further investigation by the police officer." *Cook*, 735 A.2d at 676.

*Commonwealth v. Rogers*, 578 Pa. 127, 135, 849 A.2d 1185, 1190 (2004).

The "totality of circumstances" test applies to the case at bar, as we have held that facts gathered during a valid, initial traffic stop may be utilized to justify a subsequent investigatory detention occurring after a police officer has indicated that a defendant is free to leave. *Kemp*, 961 A.2d at 1260 (overruling panel decisions in *Commonwealth v. Ortiz*, 786 A.2d 261 (Pa.Super. 2001) and *Johnson* limiting inquiry to observations made between completion of first investigative detention and commencement of reengagement).

Here, the totality of circumstances observed by Officer Johnson during the traffic stop Appellant supplied reasonable suspicion to support the second investigative detention and pat-down for weapons in the interest of officer safety. As noted by the suppression court:

> The Officer testified to reasonable suspicion beyond the original reasonable suspicion, which led to the traffic stop. The Officer provided the Court with unrebutted, credible testimony. The facts adduced by the Officer during the valid traffic stop provided him with sufficient reasonable suspicion that criminal activity was afoot justifying the investigatory detention. These facts included:
>
> - Initially, when approaching the vehicle to return the documents to [Appellant], the Officer noticed that the [Appellant] was looking at him in the side view mirror on the driver's side. N.T. 3/11/14 at 20, 21. This eye contact concerned him because he learned from a street survival school, which deals with officers who have been shot in the line of duty, that a red flag is "if someone keeps making eye contact with you or they keep wanting to know where you are, they will keep looking in the rearview mirror and in the side view mirrors." N.T. at 22.
>
> - Also, while approaching the vehicle, the Officer observed the [Appellant] moving around the driver's compartment of the vehicle; the [Appellant] was moving "towards the right side of the driver's compartment" of the vehicle and the [Appellant's] shoulder dipped in that direction as well. N.T. at 20. Officer Johnson testified that such movement was an officer safety concern because "[y]ou are taught that if you can't see their hands, the hands are what is going to kill you. The issue is going to be in the hands and you need to see the hands, and his hands were obviously moving around the driver's compartment." N.T. at 21.

- 13 -

- The [Appellant] provided a description of his route that was inconsistent with what the Officer observed. For example, the [Appellant] stated that he was coming up Sharon Avenue before he turned onto Chester Pike. N.T. at 22. However, the Officer observed the [Appellant] on Chester Pike and was following the [Appellant] on Chester Pike when the two of them passed the intersection of Sharon Avenue and Chester Pike. N.T. at 23.

Order Denying Defendant's Motion to Suppress Evidence, filed May 6, 2014, at 10-11.[2]

Based on these observations, the officer reasonably asked Appellant if he was carrying a weapon in the car and, ultimately, conducted a protective search. Notably, the officer posited this question in a seamless segue from informing Appellant he was free to leave on the motor vehicle code-based matters to asking immediately if he possessed a weapon.[3] In this regard, it

_____

[2] In conducting the reasonable suspicion inquiry in **Rogers**, our Supreme Court recognized the importance of a police officer's professional experience in identifying suspicious circumstances from ostensibly innocuous situations, such as, for example, knowing that the presence of an open box of laundry detergent in a car interior suggests an attempt to mask the odor of illegal narcotics. **Id.** at 1190. Similarly, it was undisputed at the suppression hearing that it is part of police training, which is based on field experience, that driver conduct such as persistent use of mirrors to keep track of an officer's location during a stop and placing one's hands where an officer cannot see them represent warning signs of a driver posing a danger to the officer. Indeed, Officer Johnson testified that his officer training emphasized these warning signs, which were exhibited by Appellant during the stop.

[3] The dashboard camera recording depicts Officer Johnson addressing Appellant at the driver's side window for approximately one and one-half minutes before returning Appellant's papers while continually speaking to
*(Footnote Continued Next Page)*

is apparent that the officer was concerned about both suspected criminality and his own safety while standing at the driver's side window. When Appellant reacted by unilaterally removing his seatbelt and returning his hands down to the area of his right hip and the center console, out of the sight of Officer Johnson, the officer's concerns were amplified and he ordered Appellant out of the car for a weapons pat-down.

We have previously held that movements of this kind during a traffic stop create reasonable suspicion of weapon possession justifying a protective search.

> During the suppression hearing, the officer provided specific facts explaining why he had reason to believe Parker was armed and dangerous, which he observed immediately after he stopped and pulled behind him. The officer explained his reasons for patting down Parker as follows:
>
> > Q: What was your original reason for patting him down?
> > A: The furtive movements I observed upon stopping him, reaching down to his right and to his left.
> > Q: Why would you pat him down because of those movements?
> > A: Based on his movements, my safety in my opinion was in jeopardy, because I didn't know if he was trying to get a weapon or not. I wanted to be sure he did not possess a weapon, so we were both safe on the traffic stop.

_(Footnote Continued)_ _____

Appellant for another twenty to thirty seconds until Appellant alights the vehicle. It is during this brief time immediately after returning the papers, according to Officer Johnson, that he asked about weapons and observed additional furtive movement—including Appellant's unsolicited removal of his seatbelt and his quick placement of hands down to his right side out of the officer's sight.

N.T., 7/10/07, at 7. At the suppression hearing, the officer also described Parker's movements as "shoulders dipping from side to side as if he was trying to retrieve something." *Id.* at 12.

On very similar facts, we have previously found that an officer articulated sufficient facts to constitute reasonable suspicion for a pat-down. In [**Commonwealth v. Wilson**, 927 A.2d 279 (Pa.Super. 2007)] immediately after the officer stopped and pulled behind the defendant, he observed him "looking into his rear view and side mirrors and his "shoulders and stuff" were moving around." 927 A.2d at 284. The defendant's "suspicious gestures and movements, in conjunction with the fact that he placed his hands inside his coat pocket as if he were reaching for something, could lead Officer Gunter to reasonably conclude that his safety was in jeopardy." **Id.** at 284–285. **See also Commonwealth v. Mack**, 953 A.2d 587 (Pa.Super. 2008) (the officer could have reasonably concluded that his safety was in jeopardy and so was justified in subjecting the defendant to a **Terry** frisk based on the defendant's "reaching movements in the vehicle while the officer approached," coupled with the time of day, the defendant's nervousness, and his lack of proper identification); **Commonwealth v. Murray**, 936 A.2d 76, 77 (Pa.Super. 2007) (the officer articulated sufficient facts to lead him to conclude the defendant could have been armed and dangerous due to his "excessive movement inside the vehicle," in addition to the hour of night and the fact that the neighborhood was a well-known narcotics area).

Examining the totality of the circumstances, the suspicious gestures and movements of Parker could have caused the officer to reasonably conclude, in light of his experience, that Parker was armed and dangerous. We "must be guided by common sense concerns that *give preference to the safety of the police officer* during an encounter with a suspect where circumstances indicate that the suspect may have, or may be reaching for, a weapon." **Stevenson**, 894 A.2d [759, 772 (Pa.Super. 2006)] (citation omitted). Accordingly, the police officer did not unlawfully search Parker.

*Commonwealth v. Parker*, 957 A.2d 311, 315-16 (Pa.Super. 2008). *See also Jones*, 874 A.2d at 120 (factoring in the reasonable suspicion inquiry the driver's inconsistent statements about course taken on his trip).

In much the same way, the circumstances discerned by Officer Johnson during the course of his valid motor vehicle stop of Appellant justified both his follow-up question about weapon possession and his subsequent request that Appellant alight the vehicle for a protective pat-down. This sequence of observations provided a valid basis for Appellant's arrest and the search and seizure of both his firearm and the narcotics found in his vehicle. Accordingly, we shall not disturb the order of the suppression court denying Appellant's motion to suppress.

In Appellant's second claim, he contends the court's pre-trial ruling to admit evidence that Appellant was on parole on the date of his encounter with Officer Johnson constituted reversible error. We disagree.

> [Our] standard of review for a trial court's evidentiary rulings is narrow. The admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

*Commonwealth v. Mendez*, 74 A.3d 256, 260 (Pa.Super. 2013) (internal quotations and citations omitted). Furthermore, "[t]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or

- 17 -

prejudicial to the complaining party." ***Commonwealth v. Lopez***, 57 A.3d 74, 81 (Pa.Super. 2012) (internal quotations and citations omitted).

Initially, we address the trial court's response that Appellant has waived this claim by presenting it in a Pa.R.A.P. 1925(b) statement too vague to have allowed the court to discern the specific challenge raised. Appellant's Pa.R.A.P. 1925(b) statement on this claim stated the following:

> The Trial Court erred and abused its discretion when it denied Appellant's motion *in limine* to exclude, and granted the Commonwealth's 404(b) motion to include, evidence of Mr. Schonfeld's parole status as of the date of the allegations at hand. The ruling stripped Appellant of his right to counsel, to the presumption of innocence, to a fair and impartial jury, to due process, and to the prohibition against double jeopardy. The Court's action violated Pennsylvania and United States rights.

Appellant's Pa.R.A.P. 1925(b) statement, filed April 2, 2015. The court opines that meaningful review of this claim could not be taken because the statement provided nothing more than a "litany of constitutional rights that the Appellant avers were violated [and constituted a statement] so vague and overly broad that it does not identify a specific error raised on appeal. This statement is the functional equivalent of no Concise Statement at all. ***Commonwealth v. McCree***, 857 A.2d 188, 192 (Pa.Super. 2004), aff'd, 924 A.2d 621 (Pa. 2007)." Trial Court Opinion at 13. We agree.

The Superior Court has stated "when issues [in a Rule 1925(b) statement] are too vague for the trial court to identify and address, that is the functional equivalent of no concise statement at all." ***Commonwealth v. Smith***, 955 A.2d 391, 393 (Pa.Super. 2008) (*en banc*) (citation omitted).

- 18 -

Thus, "when an appellant fails to identify in a vague Pa.R.A.P.1925(b) statement the specific issue he/she wants to raise on appeal, the issue is waived, even if the trial court guesses correctly and addresses the issue in its Pa.R.A.P. 1925(a) opinion." *Commonwealth v. Lemon*, 804 A.2d 34, 38 (Pa.Super. 2002).

Here, Appellant's statement, representing nothing more than a catalogue of basic rights, failed to apprise the trial court of the actual challenge he would raise in this regard, *i.e.*, that the court erroneously relied on what Appellant contends was inapposite decisional law to reach the conclusion that the probative value of Appellant's parole status as proof of motivation to injure Officer Johnson if necessary to escape arrest outweighed the prejudicial impact of other bad acts evidence. Indeed, nothing in the concise statement's broadly-stated recital of general rights so much as alludes to this argument. Accordingly, we agree with the trial court that its ability to review Appellant's claim meaningfully was sufficiently hampered by Appellant's statement to warrant the sanction of waiver.[4]

_____

[4] Even if we were to review this claim on the merits, we would find it meritless. In *Commonwealth v. Mollett*, 5 A.3d 291 (Pa.Super. 2010), this Court held that evidence of the appellant's state parole status provided probative evidence of his motive to commit murder in order to avoid being captured and returned to state prison for violating parole and, accordingly, outweighed its prejudicial impact. Here, Appellant, a parolee, was carrying a firearm and transporting narcotics when Officer Johnson encountered him. His parole status was, therefore, as the trial court opines, "relevant and necessary to establish the Appellant's motive and intent to attack Officer Johnson and flee the scene. He had motive and intent not to be returned to

*(Footnote Continued Next Page)*

In Appellant's third and final claim, he contends that the trial court's order bifurcating the charge of Persons Not to Possess Firearms violated this Court's decision in **Commonwealth v. Valentine**, 191 A.3d 801 (Pa.Super. 2014), in which we held that "the trial court performed an impermissible legislative function by creating a new procedure in an effort to impose the mandatory minimum sentences in compliance with **Alleyne** [**v. United States**, 133 S.Ct. 2151 (2013)]." **Id.** at 811. Specifically, Appellant contends that **Valentine** extends beyond Alleyne's mandatory minimum concerns and applies to prohibit any trial court attempt to effectively legislate a new procedure not authorized by statute or rule.

As was the case with Appellant's previous claim, the present claim is subject to Pa.R.A.P. 1925 waiver doctrine, for Appellant altogether failed to raise this claim in his concise statement. **See** Pa.R.A.P.1925(b)(4)(vii) (providing issues not included in the Rule 1925(b) statement or raised in accordance with Rule 1925(b)(4) are waived; **see also Commonwealth v. Lord**, 719 A.2d 306, 308 (Pa. 1998), **superseded by rule on other grounds as stated in Commonwealth v. Burton**, 973 A.2d 428, 431 (Pa.Super. 2009).

_(Footnote Continued)_ ─────────────────

prison on new firearms and drug charges, not to receive state parole back time, and to avoid an increased potential sentence due to his substantial prior criminal record." Trial Court Opinion at 15. We agree that our rationale employed in **Mollett** applies with equal force in the case _sub judice_, and we would, therefore, reject Appellant's claim on such basis if we addressed it on the merits.

Even if we were to address this claim, we would discern no merit to it. In **Valentine**, this Court clearly confined its decision to matters involving **Alleyne** and mandatory minimum sentencing provisions. **See Valentine**, 101 A.3d at 811 ("We find that it is manifestly the province of the General Assembly to determine what new procedures must be created *in order to impose mandatory minimum sentences in Pennsylvania following* **Alleyne**."; "[T]he trial court performed an impermissible legislative function by creating a new procedure *in an effort to impose the mandatory minimum sentences in compliance with* **Alleyne**.") (emphasis added). We, therefore, see no support for Appellant's suggestion that **Valentine** extends to the bifurcation of his Persons Not to Possess charge from the remaining charges. Moreover, as conceded by Appellant, unlike in **Valentine**, there was no relevant, governing statutory language from which the trial court deviated when it decided to bifurcate the proceedings. For that matter, the court settled on bifurcated proceedings with the consent of both parties and in the interest of avoiding prejudice to Appellant. Therefore, were we to decide this issue on its merits, we would reject it.

Judgment of Sentence is AFFIRMED.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>8/24/2016</u>