**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Alberto ORTIZ, Appellant.**

Superior Court of Pennsylvania.

Submitted March 26, 2001.
Filed Nov. 5, 2001.

David J. Long, Reading, for appellant.

Kelly S. Fox, Assistant District Attorney, Reading, for Com., appellee.

Before: JOHNSON, ORIE MELVIN, and KELLY, JJ.

JOHNSON, J.

¶ 1 Alberto Ortiz appeals from the judgment of sentence entered following his conviction of Possession of a Controlled Substance, Possession with Intent to Deliver a Controlled Substance, Possession of Drug Paraphernalia, and Driving while Operating Privilege Revoked or Suspended *See* 35 P.S. § 780–113(a)(16), (30), (32), 75 Pa.C.S. § 1543(b) (respectively). Ortiz contends that the suppression court erred in refusing to suppress drug evidence discovered during a search of his car and that there was insufficient evidence to support the verdict. After study, we conclude that the court erred in refusing to suppress evidence obtained during an unlawful search. Accordingly, we reverse the judgment of sentence and remand for further proceedings consistent with this Opinion.

¶ 2 This case arises from a traffic stop in the Borough of Wyomissing, Berks County. While on patrol, Officer Paul Baur of the Borough of Wyomissing Police Department, observed Ortiz driving a vehicle in an erratic fashion. Officer Baur activated his emergency light, directing Ortiz to pull over. Officer Baur stopped Ortiz on the suspicion that Ortiz's rear window was tinted illegally. Ortiz parked the car in front of a convenience store and attempted to enter the store. Officer Baur stopped Ortiz and informed him that he was being

detained because of the tinted window. In response, Ortiz indicated that the car belonged to someone else. Officer Baur requested Ortiz's driver's license and vehicle registration. Ortiz handed Officer Baur two pieces of paper and gave his date of birth. Officer Baur instructed Ortiz to stay in the car as he checked Ortiz's information. Although he complied initially, Ortiz repeatedly exited the vehicle. Consequently, Officer Baur insisted that Ortiz stay in the car. On the fourth occasion, Ortiz approached Officer Baur's vehicle and asked if he would be able to leave that evening. Officer Baur assured him that everything at that point was fine but that Ortiz would have to remain in his car. Police dispatch informed Officer Baur that Ortiz's driver's license had been suspended for a DUI related conviction but that the vehicle's owner had given Ortiz permission to operate the car. Officer Baur then measured the tint in the rear window with a tint meter and determined that the light permitted to pass through the tint was below the legal minimum. Officer Baur issued a written warning instructing Ortiz to have the tint removed within five days. Thereafter, Officer Baur returned Ortiz's paperwork and told him he was free to leave. Further, Officer Baur indicated that Ortiz could not drive the car due to the suspended license. As Ortiz collected his belongings, Officer Baur asked Ortiz if he had anything illegal in the car. When Ortiz said "no," Officer Baur asked if he could search the car. Ortiz consented. Officer Baur's search of the vehicle uncovered a sandwich bag containing a powdery substance later identified as cocaine, several small red baggies, a V-shaped, cardboard scoop, a folded dollar bill, and a small cut straw. Officer Baur then arrested Ortiz and the Commonwealth subsequently charged him with the commission of the aforementioned crimes. Prior to trial, Ortiz filed a motion to suppress the evidence seized during the search, which the suppression court subsequently denied. Following a bench trial, the trial court found Ortiz guilty of the charges and imposed an aggregate sentence of no less that four years', three months' and no more than six years' incarceration. Ortiz then filed this appeal.

¶ 3 Ortiz presents the following issues for our review:

A. Did not the trial court err by denying [Ortiz's] motion to suppress evidence seized from the vehicle that he was driving?

B. Was not the evidence insufficient to support the verdict, in that it did not establish beyond a reasonable doubt that Ortiz ever exercised dominion or control over the item seized from the vehicle, so that the motion for judgment of acquittal should have been granted?

Brief for Appellant at 4. Because our disposition of this matter turns on our discussion of Ortiz's first question, we shall not reach his second question.

¶ 4 When reviewing the suppression court's denial of a motion to suppress, we must first ascertain whether the record supports the suppression court's factual findings. *See Commonwealth v. Dangle,* 700 A.2d 538, 539 (Pa.Super.1997). When reviewing rulings of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. *See Commonwealth v. Lynch,* 773 A.2d 1240, 1243 (Pa.Super.2001). We are bound by the suppression court's findings if they are supported by the record, and may only reverse the suppression court if the legal conclusions drawn from the findings are in error. *See Commonwealth v.*

*Perry,* 710 A.2d 1183, 1184 (Pa.Super.1998).

¶ 5 In support of his first question, Ortiz contends that the trial court erred in refusing to suppress drug evidence seized during a search of his vehicle. Brief for Appellant at 9. Ortiz argues that Officer Baur had neither a warrant nor a valid consent to perform the search. Brief for Appellant at 6. Specifically, Ortiz relies on the factual similarities between *Commonwealth v. Freeman,* 563 Pa. 82, 757 A.2d 903 (2000), and his own case. Brief for Appellant at 13. As such, Ortiz contends that our Supreme Court's holding in *Freeman* controls in this matter. Brief for Appellant at 13. Following scrutiny of *Freeman* and the companion case, *Commonwealth v. Strickler,* 563 Pa. 47, 757 A.2d 884 (2000) we conclude that Officer Baur reinitiated an investigative detention without the requisite reasonable suspicion and, consequently, performed an illegal search. Accordingly, we conclude that the court erred in failing to suppress contraband obtained as a result of the illegal search.

¶ 6 The distinctions apparent between the *Strickler* and *Freeman* cases, when applied to the facts of this case, manifest the trial court's error. In *Strickler,* the officer observed the defendant and a friend urinating on the side of a rural roadway. The officer pulled over to discern what the men were doing. The officer approached the men, asked for identification and returned to his vehicle to check for any outstanding warrants. After verifying that there were no warrants for either of the men, the officer called the defendant over, returned his license, admonished him for his conduct, thanked him for his cooperation and began walking back to his cruiser. The officer then turned around and asked the defendant if he had anything illegal in the car. When the defen-

dant told the officer that he did not, the officer asked if he could search the defendant's car. Noticing the defendant's hesitation, the officer told him that he did not have to consent to the search, after which, the defendant consented to the search. The search revealed drug paraphernalia between the console and the front passenger seat.

¶ 7 In *Freeman,* a trooper observed the defendant jockeying for position with another vehicle along Interstate 80. The trooper, with the assistance of another officer, stopped and detained the defendant and the driver of the other vehicle. The drivers were questioned separately. The defendant gave the officer her license and indicated that she was lost, thus explaining her driving. She also told the trooper that she was not traveling with the occupants of the other car. While checking the defendant's license for outstanding warrants, the trooper discovered, from the other officer, that the occupants of the second vehicle stated the two cars were traveling together. Upon returning to the defendant's car, the trooper returned the defendant's driver's license and registration, gave her a written warning and informed the defendant that she was free to leave. The trooper then returned to his cruiser and observed that the defendant had not moved. The trooper returned to the car and again asked the defendant if she was traveling with the other car which, at this point, was still being detained by other officers. The defendant again stated that she was not traveling with the other vehicle. The trooper informed the defendant of the story given by the other driver and asked her to step out of the car. The officer then asked her consent to search the car, which she gave. The search ultimately revealed five Ziploc bags of marijuana.

¶ 8 In both cases, our Supreme Court was asked to determine whether under the Fourth Amendment, evidence seized during the course of a consensual search must be suppressed where the consent followed the conclusion of a lawful detention. While the analysis employed in both cases is similar, the factual distinctions demarcate the salient rules of law to be applied in this case. The first crucial inquiry that the Court addresses, in both cases, is when does the initial investigative detention end. This distinction is crucial because if the subsequent interaction were merely a continuation of the initial lawful detention, the analysis shifts to a determination of whether the consent is given voluntarily. *See Strickler,* 757 A.2d at 888–89 (stating that "[w]here the underlying encounter is found to be lawful, voluntariness becomes the exclusive focus[ ]"). Conversely, if the subsequent police/citizen interaction follows a detention that has properly concluded, then that interaction must be analyzed anew to determine whether it amounts to a constitutionally valid seizure or merely a casual encounter.

¶ 9 In both cases, the police officers did, initially, conduct a lawful detention of the defendant and thereafter returned the defendants' driver license and registration. In *Freeman,* the Court found that "the arresting trooper articulated a clear endpoint to the lawful detention by advising Freeman that she was free to depart after returning her driver's documentation and issuing an appropriate traffic warning." *Freeman,* 757 A.2d at 907. Similarly, in *Strickler,* the Court found that "[a]lthough the officer did not make the endpoint of the lawful detention an express one, there was an endpoint nonetheless . . . ." *Strickler,* 757 A.2d at 901 (emphasis added). The Court reasoned that "a central consideration will be whether the objective circumstances would demonstrate to a reasonable citizen that he is no longer subject to police domination." *Id.* at 899 (observing that whether the police inform the citizen that he is free to leave weighs heavily in that consideration).

¶ 10 Having concluded that the initial detentions were separate from the subsequent police/citizen interactions, the Court considered next whether those subsequent interactions were consistent with either a mere casual encounter or an investigative detention. Essential to the Court's analysis, in both cases, is whether under the circumstances, a reasonable person would feel free to leave. The Court, in *Freeman,* enumerates several factors to be considered in determining whether a seizure has been effected, as follows:

the existence and nature of any prior seizure; whether there was a clear and expressed endpoint to any such prior detention; the character of police presence and conduct in the encounter under review (for example—the number of officers, whether they were uniformed, whether police isolated subjects, physically touched them or directed their movement, the content or manner of interrogatories or statements, and "excesses" factors stressed by the United States Supreme Court); geographic, temporal and environmental elements associated with the encounter; and the presence or absence of express advice that the citizen-subject was free to decline the request for consent to search.

*Freeman,* 757 A.2d at 906–07 (citing *Strickler,* 757 A.2d at 889).

¶ 11 In *Strickler,* the Court concluded that the subsequent conduct was consistent with a casual encounter and accordingly not a seizure requiring any degree of suspicion to justify the encounter. 757 A.2d at 901. In reaching this conclusion, the Court found significant the fact that: 1) the police officer did not touch the de-

fendant or direct his movement; and 2) the officer told the defendant that he did not have to give his consent. *See id.* at 901–02. Conversely, in *Freeman,* the Court concluded that the subsequent interaction was an investigative detention requiring the Commonwealth to demonstrate that an articulable, reasonable suspicion existed to justify the detention. 757 A.2d at 907–08. There, the Court found significant the fact that: 1) notwithstanding that the officer told the defendant she was free to leave, he re-approached her car and asked her about her relationship with the other driver; and 2) the officer asked the defendant to step out of the car. *See id.* (concluding that despite express advice that Freeman was free to leave and given everything that came before, a reasonable person would believe that such advice was no longer operative).

■■ ¶ 12 In the present matter, as in *Freeman,* the officer concluded the initial detention by returning Ortiz's documentation and expressly informing him that he was free to leave. Clearly, a reasonable person would conclude that he was free to leave after being expressly told as much. Thus, the officer's subsequent interaction with Ortiz must be evaluated on its own to determine whether that encounter demonstrated either a seizure or a casual encounter. *See Freeman,* 757 A.2d at 908. Here, Officer Baur pulled over Ortiz in the parking lot of a convenience store at approximately 10:30 p.m. Officer Baur stopped Ortiz because he suspected that the car had an illegally tinted rear window. Findings of Fact and Conclusions of Law, 7/26/00, at ¶ 4. Officer Baur then took papers Ortiz handed him and checked Ortiz's record for outstanding warrants. Findings of Fact and Conclusions of Law, 7/26/00, at ¶ 6, 7. While awaiting information from dispatch, Officer Baur repeatedly instructed Ortiz to stay in his vehicle

and observed that Ortiz was sweating heavily. Findings of Fact and Conclusions of Law, 7/26/00, at ¶ 8, 13. Upon discovering that Ortiz had permission to drive the vehicle but that he was doing so under a suspended license, Officer Baur: 1) gave Ortiz a written warning; 2) told him he was free to leave; and 3) informed him that he could not drive the car. Findings of Fact and Conclusions of Law, 7/26/00, at ¶ 11, 12, 14. Although Officer Baur told Ortiz he was free to go, he remained behind Ortiz and asked if he had anything illegal in the car and if he could search the vehicle. Findings of Fact and Conclusions of Law, 7/26/00, at ¶ 15, 16. In view of the fact that: 1) the stop took place at night; 2) Ortiz could no longer drive the vehicle; and 3) he was told he could leave yet the officer stood behind him as he gathered his belongings; coupled with the fact that Officer Baur failed to inform Ortiz that he did not have to consent to the search, a reasonable person would not feel free to leave. Thus, we conclude that Ortiz was subject to a second detention necessitating a commensurate degree of suspicion on the officer's part to justify his coercive actions and the resulting impact on Ortiz's constitutionally protected interests. *See Freeman,* 757 A.2d at 907–08 (despite express advice that Freeman was free to leave and given everything that came before, a reasonable person would believe that such advice was no longer operative).

■ ¶ 13 While Ortiz's behavior during the initial investigative detention may have merited further inquiry to determine if his anxiety was due to illegal conduct, nothing happened **after** the conclusion of the initial stop to provide Officer Baur further cause for suspicion. *See Freeman,* 757 A.2d at 908. Without the existence of a reasonable suspicion after the first encounter had ended, the second detention was unlawful. Furthermore, Ortiz's con-

sent "will not justify the otherwise illegal search unless the Commonwealth can demonstrate that [his] consent was an independent act of free will and not the product of the illegal detention." *Freeman*, 757 A.2d at 909 (quoting *Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). However, because of the temporal proximity between the detention and the consent for the search and the lack of any intervening circumstances, which would demonstrate that the consent was an act of free will, it is impossible for the Commonwealth to demonstrate that Ortiz's consent was not the product of the detention. *See id.* Therefore, we conclude that because Ortiz's consent is invalid, the fruits of the consequent search should have been suppressed.

¶ 14 For the foregoing reasons, we reverse the judgment of sentence and remand this case to the trial court for further proceeding consistent with this Opinion.

¶ 15 Judgment of sentence **REVERSED**. Case **REMANDED** for further proceedings consistent with this Opinion. Jurisdiction **RELINQUISHED**.

¶ 16 Orie Melvin, J. files a Dissenting Opinion.

ORIE MELVIN, J., Dissenting.

¶ 1 I disagree with the majority that the trial court erred in refusing to suppress the evidence obtained in this consensual search. Because I find the trial court properly analyzed the traffic stop as a single event, I respectfully dissent.

¶ 2 Appellant argues the trial court should have excluded the evidence seized after this traffic stop because police had no warrant or valid consent to search. He admits he was the subject of a traffic stop, was given a warning, and was told he was free to leave. Appellant's Brief at 13.

However, he claims he then became the subject of a second investigative detention when the officer asked him to consent to a search. He argues the mere fact he was nervous and sweating does not provide the requisite suspicion for a further investigative detention. Based on his allegation that there was a second investigative detention which was not supported by reasonable suspicion, appellant claims the resulting search vitiated his consent.

¶ 3 The majority makes no mention of our *en banc* decision in *Commonwealth v. Hoak*, 700 A.2d 1263 (Pa.Super.1997), *aff'd by an equally divided court*, 557 Pa. 496, 734 A.2d 1275 (1999). There we addressed the issue of whether, after concluding a lawful traffic stop, returning the driver's license and registration and stating "you are free to leave," a police officer's follow-up question constituted an investigative detention unsupported by reasonable suspicion, which vitiated a defendant's consent to search. We found it did not. We reasoned:

Not all personal intercourse between police and citizens involved seizures of persons. There is no constitutional prohibition against the police questioning an individual in a public place. So long as a reasonable person would feel free to go about his or her business, the encounter is consensual and no reasonable suspicion is required. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.

Thus, individuals have been seized only if there is an objective reason to believe they are not free to end their conversation with police and proceed on their way.

*Id.* at 1266. In *Hoak*, the officer made a valid traffic stop, issued a warning, returned the driver's registration and license

to the defendant and specifically advised him he was free to leave. *Id.* at 1267. We found this clearly communicated to the defendant, or any reasonable person in his position, that all business was done and the stop was concluded. Applying the test set forth in *U.S. v. Mendenhall,* 446 U.S. 544, 553–554, 100 S.Ct. 1870, 64 L.Ed.2d 497, we held once the traffic stop was over, there was no show of force, no threatening presence, no display of weapon, no physical touching or use of language or tone to communicate that compliance with the officer's request to search was compelled. We concluded absent some coercive conduct by police, a request for cooperation or consent to search does not automatically convert an undeniably permissible encounter into an illegal seizure. Accordingly, in *Hoak,* the subsequent consent to search was valid.

¶ 4 In my view, Appellant presents this Court with no different fact situation than *Hoak.* He admits he was told he was free to leave, his documents had been returned to him and the stop was over. It was only when Appellant tried to drive away, having been warned that his license was suspended and he was free to leave, albeit on foot, that the Officer asked to search the vehicle.

¶ 5 The majority accepts Appellant's reliance on the holding in *Commonwealth v. Freeman,* 563 Pa. 82, 757 A.2d 903 (2000) and his attempts to distinguish *Commonwealth v. Strickler,* 563 Pa. 47, 757 A.2d 884 (2000). However, I am not persuaded. In *Freeman,* after a traffic stop was concluded, the officer continued to question the defendant, and when the officer determined she had lied to him, he ordered her out of the car. As she walked to the rear of the vehicle with the officer, he asked if he could search the vehicle. The officer ordered the defendant and her passengers to move away from the vehicle. When

they failed to obey his orders and began to remove items from the vehicle, the officer asked the other officers on the scene for assistance. Accordingly, our Supreme Court determined the first investigative detention ended with the officer telling the defendant she was free to leave, but when he approached again, a second investigative detention began. Our Supreme Court found:

> The transition to and character of the subsequent interaction, however, supports the conclusion that Freeman was subject to a second seizure. Since the trooper had accomplished the purpose of the stop, as he expressly indicated, Freeman would have been entirely within her rights to drive away at that point. Nevertheless, the trooper's subsequent actions were inconsistent with his statement to Freeman that she was free to leave, as he: returned to Freeman's vehicle; questioned her about the second vehicle; pointed out the inconsistent statements from the vehicle's occupants when she denied traveling with that vehicle; and, ultimately and most significantly, asked her to step out of the vehicle prior to the request for consent. Such directive constituted a greater show of authority than had previously been made (other than the physical stop of Freeman's vehicle itself.)

*Freeman,* 563 Pa. at 89–90, 757 A.2d at 907–908.

¶ 6 The facts of the companion case, *Strickler,* however, lead to a different outcome. In *Strickler,* a uniformed officer on routine patrol noticed a vehicle left unattended at the side of the road, alongside the lawn in front of a farmhouse and barn. *Strickler* at 53, 757 A.2d at 886. The officer also noted two men standing approximately fifteen feet from the vehicle apparently urinating. The officer approached to investigate. After verifying

his drivers' license information and no warrant status, the officer returned the license, warned the defendant his conduct was inappropriate and thanked him for his cooperation. *Id.* After taking a few steps away, the officer turned back and asked the defendant if he had anything illegal in the car. Although he had not been told he was free to go after the initial stop, the officer did advise the defendant he was free to refuse a search. The defendant hesitated at first but then consented, and the officer eventually found contraband in the vehicle. After Superior and Supreme Court review, the ultimate holding in *Strickler* is the evidence under these facts should not have been suppressed because the initial detention was lawful; there was no further detention, and the consent was not tainted.

¶ 7 Comparing the present case to *Strickler* and *Freeman,* there is no dispute in any of these cases that the initial encounter with the police constituted a lawful investigative detention. However, I find *Strickler* and *Freeman* differ because in *Freeman,* after the initial stop was concluded, the trooper returned to question Ms. Freeman further. Although he said the stop was over and she was free to leave, his conduct conveyed otherwise. The additional questioning in *Freeman,* and most significantly ordering her out of the car, was viewed as a second seizure, unsupported by reasonable suspicion that criminal activity was afoot. Contrary to the majority, I find the traffic stop in the present case, more factually aligned with *Strickler* than *Freeman.* Appellant, in the present case, was told he was free to leave, and the officer did nothing to convey otherwise. He did, however, advise the appellant he could not drive the car away from the scene because the officer had already determined from the license check that the appellant's license was suspended. The officer issued only a warning for the vehicle code violation concerning the tinted windows and did not immediately cite appellant for driving under suspension. The officer did not order appellant out of the car, nor did he escalate the encounter with further questioning. The record reflects the car was lawfully parked in the parking lot of a convenience store where appellant could have easily walked away. Accordingly, I respectfully dissent on this issue.

¶ 8 Furthermore, appellant's argument that there was a second seizure unsupported by reasonable suspicion that criminal activity was afoot, conveniently ignores the fact that Officer Baur only discovered appellant was driving under suspension after he made a record's check. Upon determining the appellant was driving under suspension, the officer had new reasonable suspicion that additional criminal activity was afoot beyond the tinted window violation. I question what else the officer was to do when he saw the Appellant attempting to drive away. If he made a second traffic stop, he did so with probable cause to believe Appellant was driving under suspension, even after he was advised not to do so. Accordingly, were I to agree there was a second detention, the further detention appellant complains of was not unlawful and thus did not vitiate his consent.

¶ 9 Finally, I write further to point out that I believe it is necessary to examine the sufficiency of the evidence for if the evidence is insufficient, Appellant must be discharged. *See Commonwealth v. Palmer,* 751 A.2d 223 (Pa.Super.2000) (where even if the ultimate outcome is suppression of the evidence which supported the conviction, the appellate court must still address a challenge to the sufficiency issue because a retrial would be precluded in the event the sufficiency issue has merit). In reviewing such a challenge, the test we apply is whether the evidence, and all rea-

sonable inferences taken from the evidence, viewed in the light most favorable to the Commonwealth as verdict-winner, was sufficient to establish all the elements of the offense beyond a reasonable doubt. *Commonwealth v. Williams,* 554 Pa. 1, 3, 720 A.2d 679, 682–683, (1998), *cert. denied,* 526 U.S. 1161, 119 S.Ct. 2052, 144 L.Ed.2d 219 (1999). The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. However, any questions or doubts are to be resolved by the factfinder, unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the circumstances. *Commonwealth v. Morales,* 447 Pa.Super. 491, 669 A.2d 1003, 1005 (1996).

> The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire trial record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. George,* 705 A.2d 916, 918 (Pa.Super.1998) *appeal denied,* 555 Pa. 740, 725 A.2d 1218 (1998) (quoting *Commonwealth v. Valette,* 531 Pa. 384, 388, 613 A.2d 548, 549 (1992) (citations and quotation marks omitted)).

¶ 10 Appellant claims the Commonwealth failed to establish he had the requisite dominion and control of the drugs that were discovered hidden in the console of the vehicle he was driving. He concedes "the element of proximity to the drugs was thus established." Appellant's Brief at 14. However, he claims the Commonwealth failed to prove he knew of their presence. He claims we must presume the drugs

belong to the owner of the car and points to the fact the vehicle belongs to another person. I do not find his argument persuasive.

> When the contraband a person is charged with possessing is not found on the person of the defendant, the Commonwealth must establish that the defendant had constructive possession of it. Our Supreme Court has defined constructive possession as the power to control the contraband and the intent to exercise that control. Constructive possession can be proven by circumstantial evidence and the "requisite knowledge and intent may be inferred from examination of the totality of the circumstances."

*Commonwealth v. Clark,* 746 A.2d 1128, 1136 (Pa.Super.2000) (Citations omitted).

¶ 11 In *Commonwealth v. Ortega,* 372 Pa.Super. 389, 539 A.2d 849 (1988), a panel of this court was asked to review a nearly identical fact situation. There, as here, the defendant claimed the Commonwealth failed to prove beyond a reasonable doubt that he possessed the contraband found in a car he was driving but did not own. The drugs in *Ortega* were found under the passenger's seat of a rented car, and the drugs in the present case were found in the middle console of a car registered to another person. In *Ortega,* appellate analysis began with first recognizing constructive possession has been defined by our Supreme Court as follows:

> Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not. We have defined constructive possession as "conscious dominion." *Commonwealth v. Davis,* 444 Pa. 11, 15, 280 A.2d 119, 121 (1971). We subse-

quently defined "conscious dominion" as "the power to control the contraband and the intent to exercise that control." *Commonwealth v. Macolino,* 503 Pa. 201, 206, 469 A.2d 132, 134 (1983)...

To aid application, we have held that constructive possession may be established by the totality of the circumstances. *Commonwealth v. Fortune,* 456 Pa. 365, 318 A.2d 327 (1974).

*Ortega* at 851 (citing *Commonwealth v. Mudrick,* 510 Pa. 305, 308, 507 A.2d 1212, 1213 (1986)).

¶ 12 As in *Ortega,* the totality of the circumstances in the present case supports a finding of constructive possession. Appellant was driving the vehicle immediately before the traffic stop. He was alone in the car. During the encounter with police, the officer noted appellant was sweating heavily despite the fact it was only 60 degrees outside that night. The drugs were found in a center console, which would be just at his right elbow as he was driving the vehicle. Most significantly, appellant attempted to distance himself from the car at least four times, and even asked the officer "is everything okay? Am I going home tonight?" Such behavior is evidence of appellant's consciousness of guilt and fear of discovery. Accordingly, I would find the Commonwealth sufficiently established constructive possession.

¶ 13 In light of the findings of fact, I find this Court overstepped its review, and the Order denying suppression should be affirmed. Accordingly, I respectfully dissent.