J-S79014-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WILLIAM D. DAVIS, | : | |
| | : | |
| Appellant | : | No. 2237 EDA 2017 |

Appeal from the Judgment of Sentence February 29, 2016
In the Court of Common Pleas of Chester County
Criminal Division at No(s):  CP-15-CR-0003579-2014

BEFORE:  GANTMAN, P.J., LAZARUS, J., and OTT, J.

MEMORANDUM BY OTT, J.:                    **FILED MARCH 06, 2018**

William D. Davis appeals from the judgment of sentence imposed on February 29, 2016, in the Court of Common Pleas of Chester County, following his conviction on charges of possession and possession with intent to deliver marijuana.[1]  Davis was sentenced to a term of 18 to 48 months' incarceration. In this timely appeal, Davis claims the trial court erred in failing to grant his motion to suppress.  Davis argues Pennsylvania State Trooper Luke Straniere did not have either reasonable suspicion or probable cause to conduct a K-9 sniff of the car he was driving.  After a thorough review of the submissions by the parties, relevant law, and the certified record, we affirm.

The trial judge provided a detailed recitation of his findings of fact in his Pa.R.A.P. 1925(a) opinion.  We have reviewed the certified record and

_____

[1] 35 P.S. § 780-113 (a)(16), (30).

determine that the record supports the findings of fact.  Rather than repeat those facts here *in toto*, we adopt them as related on pages 1-11 of the Trial Court Opinion dated December 3, 2015.  For ease of reference, we note that Trooper Straniere initially conducted a lawful traffic stop after witnessing the vehicle driven by Davis, following a tow truck too closely and travelling 73 mph in a 65 mph zone.  This traffic stop occurred September 4, 2015, at 1:40 p.m., on I-76, approximately at mile marker 304, near West Nantmeal Township in Chester County.  Trooper Straniere did not issue Davis a citation.  After returning relevant paperwork to Davis and telling him he was free to leave, Trooper Straniere asked Davis more questions, which Davis voluntarily answered.  Shortly into that conversation, the trooper asked Davis if he could search the car.  Davis declined and sought to leave.  However, Trooper Straniere had already determined Davis's passenger was wanted on a warrant out of Harrisburg.  The trooper told Davis he was free to leave, but his car was not.  At this point, the Commonwealth concedes,[2] the interaction between Davis and Trooper Straniere went from a mere encounter to an investigative detention.  Subsequently, back-up arrived and Davis's passenger, Abraham Reese, was taken into custody, and a K-9 unit arrived to conduct a sniff search of the car.  The K-9 alerted to the trunk and approximately 14 pounds of marijuana were found therein.

We begin our analysis by reciting our well-settled standard of review:

_____

[2] **See** Commonwealth Brief at 15.

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.

*Commonwealth v Jones*, 874 A.2d 108, 115 (Pa. Super. 2005) (citation omitted).

Additionally, our review is limited to the record developed during the suppression hearing; we may not consider evidence presented only at trial. *See generally In re L.J.*, 79 A.3d 1073 (Pa. 2013). This admonition is tempered herein by the fact that Davis was found guilty by stipulated facts from the suppression hearing. Accordingly, the evidence presented at the suppression hearing is identical to the trial evidence.

Further, "there need not be probable cause to conduct a canine search of a place; rather, the police need merely have a reasonable suspicion for believing that narcotics would be found in the place subject to the canine sniff." *Commonwealth v. Rogers*, 849 A.2d 1185, 1190 (Pa. 2004).

Finally, a determination of reasonable suspicion is based upon the totality of the circumstances. We recognize that,

the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Rogers*, 849 A.2d at 1189 (citation omitted).

Given the facts as cited above and as found by the trial court, we must determine whether Trooper Straniere possessed a reasonable suspicion that

- 3 -

criminal activity was afoot when he detained Davis. ***See Commonwealth v. Kemp***, 961 A.2d 1247, 1260 (Pa. Super. 2008) (facts gathered during a legal traffic stop may support investigatory detention even after suspect has been informed he may leave). Here, Trooper Straniere, a veteran Trooper with significant specialized training in criminal interdiction, related multiple indicators that led to his suspicion. The trial court found the following:

> The following circumstances are highlighted from the above findings of fact [pages 1-11] in support of this conclusion.
>
> When the trooper first approached the car, [Davis] announced that the car was owned by a third party, before the officer had even spoken. [Davis] was very nervous throughout the incident; he was overly friendly, laughing, burping and joking.
>
> When asked about his passenger, Reese, [Davis] again gave unsolicited information, telling the trooper that all the information the trooper had about Reese was correct, including his address. Reese's later answers to the trooper's questions contradicted what [Davis] had said.
>
> [Davis] carried an air freshener spray in his pocket, which is an odd item to carry, and a product that can be a masking agent for odorous items such as marijuana.
>
> Reese was highly nervous. He was sweating and would not engage in eye contact or conversation with the trooper. He was on his cell phone. Reese wore a long sleeved shirt depicting marijuana leaves.
>
> The two men gave conflicting stories of where they had been and what they had done. Although separated after the stop, both men were on their phones and able to communicate with one another. After they had the opportunity to text one another, [Davis] interrupted an unrelated conversation with the trooper to change his initial version of events to align with Reese's version.

- 4 -

The two also gave conflicting answers about luggage. Initially, Reese responded that they had overnight bags. When [Davis] was asked if there was anything in the trunk, he said no, just personal. Later, when the trooper asked Reese if he had any weapons in his bags or luggage inside the car, Reese indicated he had no luggage.[12]

> [12] When he approached the car for the initial stop, the trooper noticed fresh handprints on the trunk of the car, indicative that someone had been in the trunk.

Reese was wanted on warrants. (This involved the trooper's time throughout the stop, to gather information, arrange transport and await confirmation.) [Davis] was on federal probation. He also had a criminal record in Pennsylvania consisting of false reports in 2008, drugs in 2009, felony drugs in 2010, resisting arrest in 2011 and simple assault in 2014.

The vehicle was coming from a drug source city, Philadelphia, and headed to another, smaller drug distribution city, Harrisburg. [Davis] may have initially said they drove to Conshohocken because those involved in drug distribution are aware of the negative reputation Philadelphia has as a source city.

It is noted that all conversations were cordial. There was no physical threat towards the two individuals. The stop was early afternoon on September 4, 2014. The trooper's questions were appropriate, as the situation evolved. Even after he first knew that he wanted to search the trunk, Trooper Straniere acquired additional information, such as [Davis's] criminal record, the appearance of texting between the men, [Davis's] efforts to conform his version of events to match Reese's version, and the change in whether or not they had luggage. These additional facts strengthened the trooper's reasonable suspicion.

While many of these facts could be innocent, when taken together under the totality of the circumstances, they amounted to reasonable suspicion that criminal activity was afoot and supported the investigative detention. It was proper for the trooper to have a canine sniff the vehicle.

Trial Court Opinion, 12/3/2015 at 16-18.

In light of the foregoing, we find no error of law in the trial court's conclusion that, based upon the totality of the circumstances, Trooper Straniere possessed a reasonable suspicion of criminal activity sufficient to support the investigative detention of Davis and the canine sniff of Davis's vehicle. Accordingly, Davis is not entitled to relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/6/18

Circulated 02/14/2018 02:30 PM

COMMONWEALTH OF PENNSYLVANIA    : IN THE COURT OF COMMON PLEAS

                                              : CHESTER COUNTY, PENNSYLVANIA

         vs                             : CRIMINAL ACTION

WILLIAM DAVIS                     : NO.  3579-14

Kevin P. Pierce, Assistant District Attorney, on behalf of the Commonwealth.
Kevin Mark Wray, Esquire, on behalf of Defendant.

## OPINION

Defendant was charged with Possession with Intent to Deliver Marijuana, 35 P.S.

780-113-A-30 and Possession of Controlled Substance, 75 P.S. 780-113-A-16.

On February 23, 2015 Defendant filed a Motion to Suppress Evidence.

Defendant's vehicle was stopped by a State Trooper on the Pennsylvania Turnpike.  In

his Motion, he states,

> "The defendant contends that the police did not have reasonable suspicion or
> probable cause to believe that the defendant was engaged in criminal activity, that the
> detention and arrest of the defendant was unlawful, and that all evidence seized as a
> result of the unlawful seizure of the defendant and his vehicle – including the
> defendant's statements and admissions and the items seized as a result of the search
> of his automobile – must be suppressed as the fruit of unlawful police conduct."

On May 12, 2015, this court held a suppression hearing, which continued on

June 10, 2015 and concluded on August 3, 2015.

Findings of Fact:[1]

Pennsylvania State Police Trooper Luke Straniere testified as follows. He has

been a trooper since 2006 and worked as an Eastern intelligence officer on the

Pennsylvania Turnpike since 2012.  He has been assigned to the Shield Unit since

---

[1] The Findings of Facts are made without benefit of a transcript of the hearing.

March, 2015. That unit runs an interdiction program to stop the flow of contraband in Pennsylvania and on the highways. Trooper Straniere has had 350 hours of training for criminal interdiction, which covered, among other things, concealed assets in vehicles, concealed drugs, how drugs are transported, individuals' behavior when stopped by the police, contraband shipment to major cities, drug trends, case law and how to conduct a traffic stop.[2]

In April, 2014, Trooper Straniere had training in what to do with a traffic stop, and criminal interdiction with commercial vehicles. He also took a three day advanced class regarding conducting a complete traffic stop, which addressed hidden compartments, driver behavior and reactions. He took several classes on interviewing and interrogation, how to question, human behavior and verbal and non-verbal communication. He has had drug training for marijuana and other controlled substances such as heroin, cocaine, methamphetamine, ecstasy, and pills, prescribed and non-prescribed.

Trooper Straniere instructs an interdiction class for the State Police. He also assisted in the Shield program and has been a ride along instructor. He has patrolled Interstates 90, 78, 80, 76, 202, 402, 222, 30, 79, 15, 99 and 220. He has performed over 4,000 traffic stops and several hundred searches. He has made 100 to 150 or more drug arrests, dozens of non-drug arrests and has testified as an expert in various county courts and district courts. He has also seized cash as an interdiction trooper.

Trooper Straniere was on duty at 1:40 pm on September 4, 2014 in an unmarked police vehicle near mile marker 304 on Route 76 in West Nantmeal Township, Chester County, Pennsylvania when he began traveling behind a light blue car. The car was

---

[2] Exhibit D-1, Trooper Straniere's resume, reflects his training and experience.

2

driving 73 mph in a 65 mph speed zone. The car was traveling directly behind a tow truck, only one car length behind, which was much too close at a high rate of speed.[3]

The trooper initiated lights and siren and pulled the car over at the 301.4 mile marker. As the trooper approached the passenger side he noticed hand prints on the vehicle's trunk. A driver and passenger were seated in the car. Defendant was the driver. Before the trooper said anything, Defendant said, "How you doing? This is my mom's car." (Joint Exhibit 1, p. 1). Trooper Straniere asked for and received his driver's license, registration and insurance documents. (Joint Exhibit 1, pgs. 1-2).

The trooper observed that the passenger was sweating and made no eye contact. He wore a long sleeve shirt with marijuana leaves printed on it.

The trooper explained the violations to Defendant; going too fast and following too closely. He returned to his vehicle's computer and tried to run checks on the driver. His computer shut down several times. He kept re-booting it. The vehicle was registered to Janet Gray in Harrisburg. Pursuant to the trooper's request, Defendant stepped out of the car and consented to a pat-down. When the trooper felt a bulge, he found a Lysol air freshener spray in Defendant's right front pocket. (Joint Exhibit 1, p. 2). The trooper told Defendant that his computer was down, and asked him to step to the police car so he could get information. (Joint Exhibit 1, pgs. 2-3).

At the same time, the trooper checked Defendant's current address and social security number, he asked Defendant where he was coming from and details about what he had been doing. (Joint Exhibit 1, pgs. 3-8). Defendant said he was coming from a friend's house in Conshohocken, where they had stayed overnight, not going out,

---

[3] This is not on the MVR video because the trooper had to find a safe place to initiate the traffic stop.

just hanging out at his house.[4] When asked about his passenger, Defendant said he was his cousin, Abraham Reese. Without being asked, he told the trooper that all of the information the trooper had on Reese was correct, including the address. (Joint Exhibit 1, pg. 6). He said that Reese was a deejay. Defendant then talked with the trooper about sports, work, and high school, making general small talk. (Joint Exhibit 1, pgs. 8-10). Defendant was nervous, laughing, burping and joking. The trooper learned from a second or third computer reboot that Defendant had a valid license and was not wanted. However, the trooper learned that he was on federal probation.

Trooper Straniere, after complaining again about his computer, went to the car to confirm the passenger's address. (Joint Exhibit 1, p. 10). In addition to asking the passenger, Mr. Reese, for his address, he asked where they were coming from and what they had been doing. (Joint Exhibit pgs. 10-11). Reese provided the trooper with a different address than what Defendant had given him for Reese. When asked about their travel, Reese said they went to Philadelphia and stayed in Philadelphia. Id. He did not mention Conshohocken, the location Defendant claimed they had been. He indicated they had stayed overnight. It appeared that he indicated they went out to clubs. Id. He refused to look at the trooper and he was sweating. He was on his phone. When the trooper asked Reese if they had "overnight bags and stuff like that," he said yes. Id. Trooper Straniere returned to his vehicle and learned that there were two warrants outstanding for Reese in Dauphin County.

---

[4] Defendant said that while visiting his friend in Conshohocken, they drove down in daylight and stayed overnight. Trooper Straniere asked, "Did you guys go out at all last night or did you just hang at the house?" Defendant replied, "Nah, just hung out at the house." (Joint Exhibit 1, p. 7).

4

He told Defendant to hang out by Defendant's trunk. Defendant went to the back of his vehicle and sat on the ground. Defendant was also on his phone. The trooper called for another back-up patrol car because the passenger was wanted. This was approximately 16 minutes after the stop. (Joint Exhibit 1, p. 12). The trooper remained in his vehicle, had further trouble with the internet, then called to ask the K-9 unit to be on standby; he was going to ask Defendant for consent to search, but wanted them alerted, to expedite it, if consent was denied. He said to the other trooper, "one way or another, I'm gonna try and search his vehicle." (Joint Exhibit 1, p.13). Trooper Straniere explained to his colleague some of the information, much of it conflicting, that he had learned from the two men and his observations. (Joint Exhibit 1, p. 13). He also said they were probably texting each other during the phone call. He had concluded, within approximately 20 to 23 minutes after first speaking with Defendant, that he wanted to search the car.[5] Id.

On the second day of testimony, June 10, 2015, the Commonwealth submitted Exhibit C-2, a copy of the motor vehicle recording (MVR) of the incident and played it for the court.[6] The recording corroborated the testimony of Trooper Straniere set forth above. It confirmed Trooper Straniere had continuous problems with the computer failing.

The trooper was greatly annoyed with the computer, which was frozen, as he tried to confirm information. Id. He then learned, approximately six minutes after telling the other trooper on the phone that he wanted to search the car, that Defendant also

---

[5] The time frames are estimates, per court notes during observation of the video during hearing.
[6] The parties both attached a transcript of what was said in Exhibit C-2 to their post-hearing briefs. The transcripts were identical. The court has marked as Joint Exhibit 1, a copy of that transcript and is filing it at the same time as the filing of this Opinion.

had a criminal history in Pennsylvania, of false reports in 2008, drugs in 2009, felony drugs in 2010, resisting arrest in 2011, and simple assault in 2014. He tried to call someone at the Dauphin County Sheriff's office. Id.

After phone discussions with other law enforcement personnel, he called Defendant over. He apologized for it taking so long, due to the computer problems, and told him that he was just issuing a warning. He returned to Defendant his information, cautioned him to slow down and watch his distance between vehicles, and told him to have a safe drive. This occurred approximately 32 minutes after the stop.

Defendant walked away. Immediately afterward, Trooper Straniere said, "Hey William. The, uh, traffic stop is over, I just had a couple more questions for you if that's ok. A lot of times what we see is people using their vehicles to transport illegal items on the turnpike, guns, valuable merchandise, stolen merchandise, uh, drugs, ....(Joint Exhibit 1, p. 14, lines 29-32).

....

" You have anything illegal with you inside the vehicle? Ok, no, no weapons with you?" Id.

Defendant responded: "Nothing on me." Id.

....

At that point Defendant randomly brought up the prior subject of what they did while in the area. He was changing his previous statement, likely after texting with Reese, to make a statement that was consistent with Reese's. (Joint Exhibit 1, p. 15). The trooper then returned to his questions.

Trooper.: "Now, the, uh, as far as any kind of, you have any marijuana with you in the vehicle?" (Joint Exhibit 1, p.15, lines 28-31).

Defendant responded: "No." Id.

The trooper proceeded to question him if he had any cocaine or heroin or anything similar. Id. Defendant answered all questions in the negative. Thereafter, the trooper asked if he could take a couple of minutes to search the vehicle, to be sure he did not have anything, and then he would send him on his way. (Joint Exhibit 1, p. 15). The trooper also asked him if he had anything in the trunk, to which the defendant responded, "No...Just personal." (Joint Exhibit 1, p. 16). Trooper Straniere reiterated to Defendant that he was free to go, but that he was asking Defendant for his consent to search the vehicle. (Joint Exhibit 1, p. 16). When Defendant replied that, "There's nothing in the vehicle but, um, I'm free to go and I just want to be on my way." (Id., lines 33-34). The trooper then replied, "You're free to go. Your car's not free to go." (Id., line 36). He told him to stand by for a second. Approximately 34 minutes had elapsed since the stop.

Trooper Straniere then began to remove passenger Reese. He asked him if he had weapons, guns, or luggage inside the vehicle, patted him down, then handcuffed him and informed him that there was a warrant for his arrest in Harrisburg. (Joint Exhibit 1, pgs. 16-17). This time Reese said he had no luggage, which conflicts with his earlier statement Id. The passenger was to be transported by the second trooper who had arrived, after they received confirmation from Dispatch on his paperwork. (Joint Exhibit 1, p. 11).

Trooper Straniere returned to speaking with Defendant. He told him again that he was free to go, but based on his training and experience, he felt like there was something potentially illegal inside the vehicle. (Joint Exhibit 1, p. 17). He wanted to believe Defendant, but "seeing was believing." Id. He informed Defendant that he could say no to the search, and the trooper would call a dog to run the car's exterior. He told Defendant he was free and that he could get a ride with the other trooper or he could wait by the car while the dog ran the car's exterior. If it did not "hit," then Defendant would be on his way. If the dog "hit," the trooper would search the car. (Joint Exhibit 1, p. 17).

The trooper reiterated the choices by stating three options: First, even though he did not have to, Defendant could let him search. Second, Defendant could say no to the search, and sit there with the vehicle until the dog arrived and did its task. The third option was that Defendant could leave with the other trooper, the dog would arrive and do its run of the vehicle and Defendant would be contacted. Id. After that, Defendant refused to allow the search. Id. The trooper went back to his vehicle and called Dispatch for a trooper to bring the dog. At that point, approximately 37 minutes had elapsed since the traffic stop.[7] The video was then stopped.

Joint Exhibit 1 reflects that as the trooper talked to Dispatch, Abraham Reese began asking questions about his case. (Joint Exhibit 1, p. 18). Trooper Straniere explained the information he had received, listing him as wanted, with full extradition. Id. He then told Reese that he would be taking a ride to Harrisburg. (Joint Exhibit 1, p. 19).

The trooper was still responsible for Reese, the wanted passenger, when Dispatch made contact with him at approximately 40 minutes after the stop, because he

---

[7] This timeframe is based upon the court's notes during the viewing of the video at hearing.

8

replied to Dispatch, "Trooper Carney is out here with me. Uh, we have one in custody, uh, on the warrant, just waiting for the confirmation to come. Sergeant Frederick, uh, also waiting on a K-9 for denied consent." (emphasis added). From this, it appears that they were unable to transport Reese pending receipt of something further that confirmed their information.

Trooper Straniere testified that Trooper Laudermilch, arrived with the dog and the dog alerted the car. The dog arrived approximately 70 minutes after the stop.[8] A box found in the trunk contained 13 to 15 pounds of marijuana. Defendant claimed full ownership of the drugs and took full responsibility. He was charged with possession with intent to deliver and possession; his passenger was not charged with crimes related to these drugs.

The trooper, who had extensive training and experience in drug interdiction, enumerated indicators during his testimony that he considered in calling for the drug dog, as follows:[9] First, it was a third-party vehicle which is often used with contraband because it creates a barrier to a direct link to the vehicle. One can say, "I did not know it was there." Before the trooper ever spoke, Defendant announced that it was his mother's car. This alerted the trooper to Defendant's disassociation with the vehicle.

As he approached, he noted fresh handprints on the trunk which meant that someone had recently used the trunk.

Passenger Reese was almost shaking he was so nervous. He kept his eyes straight ahead; he made no eye contact with the officer. He wanted no interaction.

---

[8] The Commonwealth states in its brief that the dog arrived 69 minutes after the stop; Defense states it was 71 minutes.
[9] Some of the factors were discussed at varying times during his testimony.

Reese's t-shirt had marijuana leaves printed on it. Trooper Straniere stated that in his experience one wears gear of things one supports.

Defendant had a bottle of Lysol disinfectant air freshener spray in his pocket. This was odd and unusual, outside the norm and is a masking agent for odors.

The trooper used a frequent interview technique, asking the same questions of both individuals. This generated conflicting answers about where they had been.[10] Later, after he spoke with them and he saw Defendant texting on his phone, Defendant interrupted an unrelated matter to tell the trooper his changed version of events, now similar to Reese's version.

The trooper also recognized that Defendant continually tried to tell him that everything was okay and they were not breaking the law. When asked at the outset about his passenger, Defendant volunteered to the trooper, unsolicited, that all of Reese's information "...is correct in there also." (Joint Exhibit 1, p. 6). He said that Reese's Walnut Street address was correct. Reese later said that the information was incorrect and his address was wrong.

The trooper testified that people show signs of stress and nervousness in different ways. He found Defendant to be very nervous. He had a high level of energy; was overly talkative, agreeable, personable and he was often spitting and burping. Reese was the opposite, introverted, not looking in the eye, visibly nervous, sweating.

Defendant was on the phone a lot, texting. The trooper found it odd when Defendant sat on the ground behind the back of his vehicle. He noted that people tend

---

[10] Defendant said they went to Conshohocken and stayed overnight at his friend Kareem's house, not going out at all. Reese said they went to Philadelphia, stayed in Philadelphia, and indicated they went to clubs.

to put physical barriers between the law and what they are protecting. In this case, it was Defendant's trunk.[11]

Trooper Straniere asked Defendant if there was anything illegal in the vehicle. He testified that Defendant was smiling during the questions until he was asked about marijuana. At that question, Defendant stopped smiling.

The trooper learned during the stop that Defendant was on federal supervision in the Harrisburg area and that he had a sizable criminal history including drug charges. The passenger was wanted on a warrant.

Trooper Straniere has experience on the Pennsylvania Turnpike as it relates to drugs. He testified that Philadelphia is a source city, a drug distribution hub and the turnpike is a trafficking route. A lot of drug traffic emanates from Philadelphia. He said that Harrisburg is also a source city. It is a smaller distribution hub. He mentioned that those involved in the drug trafficking may not mention Philadelphia because of its reputation, inferring that Conshohocken could be a cover in this matter.

Trooper Straniere's testimony was found to be credible.

Discussion:

"Where a motion to suppress has been filed, the burden is on the Commonwealth to establish by a preponderance of the evidence that the challenged evidence is admissible." Commonwealth v. Irwin, 769 A.2d 517, 520 (Pa.Super. 2001), quoting Commonwealth v. Anderson, 753 A.2d 1289, 1291 (Pa.Super. 2000) and Commonwealth v. Hamilton, 673 A.2d 915, 916 (Pa. 1996).

---

[11] Considering the location, alongside the turnpike, and the trooper's instruction to Defendant to go over by his car, this "indicator" is disregarded.

11

It is well established in Pennsylvania law that there are three categories of interaction between police officers and citizens. "The first is a 'mere encounter,' which need not be supported by any level of suspicion." Commonwealth v. Caban, 60 A.3d 120, 127 (Pa.Super 2012), citing Commonwealth v. Acosta, 815 A.2d 1078, 1082 (Pa.Super. 2003). "The second is an 'investigative detention,' which must be supported by reasonable suspicion." Id. "This interaction 'subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest.'" Caban, 60 A.3d at 127, quoting Commonwealth v. Phinn, 761 A.2d 176, 181 (Pa.Super. 2000), citing Commonwealth v. Ellis, 662 A.2d 1043, 1047 (Pa. 1995).

"The third category, a 'custodial detention,' must be supported by probable cause." Id. "'The police have probable cause where the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed.'" Caban, 60 A.3d at 127, quoting Commonwealth v. Hernandez, 935 A.2d 1275, 1284 (Pa. 2007), quoting Commonwealth v. Rogers, 849 A.2d 1185 (Pa. 2004).

In Commonwealth v. Strickler, the Pennsylvania Supreme Court set forth the following factors to assist in determining whether the interaction between a defendant and a police officer following the conclusion of a valid traffic stop is a mere encounter or an investigative detention:

> (1) the presence or absence of police excesses; (2) whether there was physical contact; (3) whether police directed the citizen's movements; (4) police demeanor and manner of expression; (5) the location and time of the interdiction; (6) the content of the questions and statements; (7) the existence and character of the initial investigative detention, including its degree of coerciveness; (8) 'the degree to which the transition between the traffic stop/investigative detention and the

12

subsequent encounter can be viewed as seamless, ... thus suggesting to a citizen that his movements may remain subject to police restraint,' ... and (9) whether there was an express admonition to the effect that the citizen-subject is free to depart, which 'is a potent, objective factor.'

Caban, 60 A.3d at 127-128, quoting Commonwealth v. Kemp, 961 A.2d 1247, 1253 (Pa.Super. 2008), quoting Strickler, 757 A.2d 884, 898–899 (Pa. 2000).

To establish reasonable suspicion to justify an investigative detention, an officer must "'articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him to reasonably conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity.'" Caban, 60 A.3d at 128, quoting Commonwealth v. Basinger, 982 A.2d 121, 125 (Pa.Super. 2009), quoting Commonwealth v. Reppert, 814 A.2d 1196, 1203 (Pa.Super. 2002).

The totality of the circumstances must be considered when determining whether the officer had reasonable suspicion. Caban, 60 A.3d at 128, citing In re D.M., 781 A.2d 1161, 1163 (Pa. 2001). "In this regard, we must give 'due weight ... to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience.'" Caban, 60 A.3d at 128, quoting Commonwealth v. Cook, 735 A.2d 673, 676 (Pa. 1999), quoting Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868 (1968).

The Pennsylvania Supreme Court noted that "the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, 'even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.'" Commonwealth v. Rogers, 849 A.2d 1185, 1189 (Pa. 2004), quoting Cook, 735 A.2d at 676. Of course, one can

conceive of innocent explanations for a variety of facts. Yet, reasonable suspicion does not require that the activity in question must be unquestionably criminal before an officer may investigate further. Rogers, 849 A.2d at 1190, citing Cook, supra. "Rather, the test is what it purports to be—it requires a suspicion of criminal conduct that is reasonable based upon the facts of the matter." Rogers, 849 A.2d at 1190.

The most recent appellate case on this issue of an investigative detention following a lawful traffic stop is the case of Commonwealth v. Nguyen, 116 A.3d 657 (Pa.Super. 2015). The Nguyen case quoted Commonwealth v. Jones, as follows: "'Where the investigative detention at issue follows a lawful traffic stop, the officer must demonstrate cause for suspicion after the end of the initial stop, and independent of any basis on which he conducted the prior stop.'" 116 A.3d 657, quoting Jones, 874 A.2d 108, 117 (Pa.Super. 2005). Applying this standard, the Nguyen court concluded that information learned prior to the ending of the initial stop based on the traffic violation could not serve as the basis of reasonable suspicion for the subsequent interaction after the initial stop ended. 116 A.3d at 669.

An examination of the Jones case upon which the Nguyen court relies reveals that the Jones court relied on a line of cases, including Commonwealth v. Ortiz, that held that an investigative detention following a lawful traffic stop must be justified by articulable reasonable suspicion of criminal activity independent of that supporting the initial stop. Jones, 874 A.2d at 117, citing Ortiz, 786 A.2d 261 (Pa.Super. 2001).

Thereafter, the Pennsylvania Superior Court clarified whether facts obtained during the initial traffic stop can be used at all in the totality of the circumstances test in assessing whether police had reasonable suspicion to conduct an investigative

14

detention. The Pennsylvania Superior Court emphatically stated, "we overrule <u>Ortiz</u> and <u>Johnson</u> to the extent that they hold that facts gathered during a valid traffic stop cannot be utilized to justify an investigatory detention occurring after a police officer has indicated that a defendant is free to leave." <u>Commonwealth v. Kemp</u>, 961 A.2d 1247, 1260 (Pa.Super. 2008), citing <u>Commonwealth v. Jacobs</u>, 900 A.2d 368, 377 n. 9 (Pa.Super. 2006).

Accordingly, the parties' reliance on the <u>Nguyen</u> court's conclusion that information learned prior to the ending of the initial stop based on the traffic violation could not serve as the basis of reasonable suspicion for the subsequent interaction after the initial stop ended is misguided.

It must also be noted that pursuant to the Pennsylvania constitution, a canine sniff is a search. <u>Rogers</u>, 849 A.2d at 1190, citing <u>Commonwealth v. Johnston</u>, 530 A.2d 74, 79 (Pa. 1987). "Yet, this type of search is not treated like other searches as it 'is inherently less intrusive upon an individual's privacy than other searches....'" <u>Id.</u> The Pennsylvania Supreme Court has "noted that 'this particular surveillance technique amounts to a relatively minor intrusion upon privacy, much less than is involved, say, in the physical entry and ransacking of a house in an effort to find a quantity of narcotics.'" <u>Id.</u> "Thus, we held that there need not be probable cause to conduct a canine search of a place; rather, the police need merely have reasonable suspicion for believing that narcotics would be found in the place subject to the canine sniff." <u>Id.</u>

Applying the above stated standards to the facts in the case at hand, this court concludes that this highly trained and experienced trooper adduced sufficient facts from the totality of the circumstances to have reasonable suspicion that criminal activity was

15

afoot to support the investigative detention and canine sniff of the vehicle. The following circumstances are highlighted from the above findings of fact in support of this conclusion.

When the trooper first approached the car, Defendant announced that the car was owned by a third party, before the officer had even spoken. Defendant was very nervous throughout the incident; he was overly friendly, laughing, burping and joking.

When asked about his passenger, Reese, Defendant again gave unsolicited information, telling the trooper that all of the information the trooper had about Reese was correct, including his address. Reese's later answers to the trooper's questions contradicted what Defendant had said.

Defendant carried an air freshener spray in his pocket, which is an odd item to carry, and a product that can be a masking agent for odorous items such as marijuana.

Reese was highly nervous. He was sweating and would not engage in eye contact or conversation with the trooper. He was on his cell phone. Reese wore a long sleeved shirt depicting marijuana leaves.

The two men gave conflicting stories of where they had been and what they had done. Although separated after the stop, both men were on their phones and able to communicate with one another. After they had the opportunity to text one another, Defendant interrupted an unrelated conversation with the trooper to change his initial version of events to align with Reese's version.

The two also gave conflicting answers about luggage. Initially, Reese responded that they had overnight bags. When Defendant was asked if there was anything in the

trunk, he said no, just personal. Later, when the trooper asked Reese if he had any weapons in his bags or luggage inside the car, Reese indicated he had no luggage.[12]

Reese was wanted on warrants. (This involved the trooper's time throughout the stop, to gather information, arrange transport and await confirmation.) Defendant was on federal probation. He also had a criminal record in Pennsylvania consisting of false reports in 2008, drugs in 2009, felony drugs in 2010, resisting arrest in 2011 and simple assault in 2014.

The vehicle was coming from a drug source city, Philadelphia, and headed to another, smaller drug distribution city, Harrisburg. Defendant may have initially said they drove to Conshohocken because those involved in drug distribution are aware of the negative reputation Philadelphia has as a source city.

It is noted that all conversations were cordial. There was no physical threat towards the two individuals. The stop was in the early afternoon on September 4, 2014. The trooper's questions were appropriate, as the situation evolved. Even after he first knew that he wanted to search the trunk, Trooper Straniere acquired additional information, such as Defendant's criminal record, the appearance of texting between the men, Defendant's efforts to conform his version of events to match Reese's version, and the change in whether or not they had luggage. These additional facts strengthened the trooper's reasonable suspicion.

While many of these facts could be innocent, when taken together under the totality of the circumstances, they amounted to reasonable suspicion that criminal

---

[12] When he approached the car for the initial stop, the trooper noticed fresh handprints on the trunk of the car, indicative that someone had been in the trunk.

activity was afoot and supported the investigative detention. It was proper for the trooper to have a canine sniff the vehicle.

Accordingly, the following order is entered:

### ORDER

AND NOW, this ___3___ day of December, 2015 upon consideration of Defendant's Motion for Suppression of Evidence, filed February 23, 2015, memoranda of law submitted by the parties and after hearing, it is hereby ORDERED and DECREED that Defendant's request to suppress evidence is DENIED and the Motion to Suppress is DISMISSED.

BY THE COURT:

*Phyllis R. Streitel*

PHYLLIS R. STREITEL.        J.

2015 DEC -3 PH 2:20
CLERK OF COURT
CHESTER CO.
RECEIVED

18